UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCIO ESTRADA,<br><br>               Petitioner,<br><br>     v.<br><br>NEIL McDOWELL, Warden,<br><br>              Respondent. | Case No. 16-cv-02827-YGR (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; AND DENYING CERTIFICATE OF APPEALABILITY** |

Petitioner Lucio Estrada, a state prisoner, brings the instant *pro se* habeas action under 28 U.S.C. § 2254 to challenge his 2010 conviction and sentence rendered in the Santa Clara County Superior Court. Petitioner and his codefendants, Esequiel Paul Garcia ("Garcia")[1] and Miguel Chaidez ("Miguel"[2]), were each convicted of first degree murder (Cal. Penal Code § 187) in connection with their participation in the March 2008 murder-for-hire plot to kill Mark Achilli ("Achilli"), codefendant Garcia's rival for the affections of Tessa Donnelly. 7CT 1507-1509. Achilli was found shot to death in the carport of his residence. *People v. Garcia, et al.*, No. H036346, 2015 WL 917801, *1 (Cal. Ct. App. Mar. 20, 2015). The jury also found true special circumstances that Petitioner committed an intentional murder for financial gain (Cal. Penal Code § 190.2(a)(1)) and while lying in wait (Cal. Penal Code § 190.2(a)(15)), and that he personally and intentionally discharged a firearm proximately causing death (Cal. Penal Code § 12022.53(d)). 7CT 1509. On November 30, 2010, the trial court sentenced Petitioner to life in prison without the possibility of parole consecutive to a term of twenty-five years to life in prison.[3] 7CT 1529.

---

[1] As to Garcia, the jury found true the aiding and abetting special circumstance (Cal. Penal Code § 190.2(c)) based on evidence that Garcia solicited the first degree murder. 7CT 1507-1509.

[2] The Court refers to Miguel Chaidez as "Miguel" because the factual background includes two other individuals named Chaidez: Miguel's brother Cesar Chaidez ("Cesar") and their cousin Daniel Chaidez ("Daniel").

[3] Garcia and Miguel both received life sentences: (1) in 2011, Miguel was sentenced to a term of twenty-five years to life in prison; and (2) in 2012, Garcia was sentenced to life in prison without the possibility of parole. *See Garcia*, 2015 WL 917801, *1.

Petitioner raises eight claims in his petition, and he relies on his "Separate Memorandum of Points and Authorities" as well as his appellate counsel's opening brief filed in the state appellate court. Dkt. 1 at 7-8; Dkt. 1-1 at 21-43; Dkt. 1-2 at 3-79; Dkt. 1-3 at 1-15.[4]

The Court notes that in "Claim Eight," Petitioner contends that the California Supreme Court's summary denial of his petition for review was contrary to, and an unreasonable application of, United States Supreme Court law and was not a decision on the merits. Dkt. 1-1 at 41-43. Such an argument is unavailing. When a state court denies a claim that has been presented to it, it is presumed to have adjudicated the claim on the merits. *Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013); *Harrington v. Richter*, 562 U.S. 86 at 99 (2011); *Crittenden v. Ayers*, 624 F.3d 943, 960 (9th Cir. 2010) ("A 'postcard' denial by the California Supreme Court is a denial on the merits"). Furthermore, "federal courts have no authority to impose mandatory opinion-writing standards on state courts." *Johnson*, 133 S. Ct. at 1095. Accordingly, Claim Eight is without merit, and it is DENIED. The Court will focus below on Claims One through Seven.

Petitioner also requests an evidentiary hearing. Dkt. 1-1 at 44-45. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES Petitioner's request for an evidentiary hearing and DENIES the petition as to all claims for the reasons set forth below.

## I. BACKGROUND

### A. Factual Background

The California Court of Appeal handled the direct appeals filed by Petitioner, Garcia, and Miguel, and in an unpublished opinion described the relevant facts as follows[5]:

> *Physical Evidence and Eyewitness Testimony*
>
> At approximately 11:40 a.m. on March 14, 2008, after he was told by a man that he had heard eight gunshots fired in rapid succession from a semi-automatic hand-gun, Los Gatos Police Officer Daniel

---

[4] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

[5] This summary is presumed correct. *See Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

2

Accardo approached the driveway of 18400 Overlook.  As he did so a white van approached; the driver of the van said he had heard the gunshots.   As the officer drove into the driveway an elderly gentleman flagged down the officer and told him that there was a badly injured man near a carport.

At 18400 Overlook, Officer Accardo saw a man lying face down in a carport; the man was bleeding from multiple places and there were spent shell casings on the ground.  Emergency personnel arrived and declared Achilli dead.  Officer Accardo was able to identify Achilli from the driver's license the officer found in Achilli's wallet, which firefighters had collected from a pocket in Achilli's pants.

Approximately two hours after the shooting, Los Gatos Police Department Corporal Kalipona Kauweloa and other officers collected evidence from the area surrounding the shooting scene. Specifically, in various different places they found a torn photograph of Achilli, a gun cleaning cloth, a black jacket recovered on Chestnut Avenue,[FN 2] two black gloves, a gun magazine, a black Los Angeles Dodger's baseball cap, a gun magazine with two unspent .380 cartridges, and a page of printed driving directions from Fish Canyon Road to 18400 Overlook.  The officers did not locate a gun.

[FN 2:] Testimony at trial showed that Chestnut Avenue is north of Overlook.

Los Gatos Police Officer Steve Walpole collected .380 shell casings, .380 bullet fragments, and a bullet jacket at the scene; all were recovered from near where Achilli's body had been.[FN 3]  Officer Walpole took a photograph of a bullet hole that was in a drain pipe. Officer Walpole removed a computer from unit No. 36[FN 4] and collected a cellular telephone that had been recovered from amongst Achilli's bloody clothing.   Achilli's body was removed from the scene by the coroner at 4:53 p.m.

[FN 3:] Paramedics moved Achilli's body approximately 12 feet east of where he was originally lying.

[FN 4:] Officer Accardo established that unit No. 36 was where Achilli lived.

On the day after the shooting, Los Gatos Police Officer Sam Wonnell retrieved a Lorcin .380 semi-automatic pistol with no rounds in the magazine from some ground ivy located in front of some of the residences at 18400 Overlook.  The next day, close to unit No. 35, Officer Wonnell found a .380-caliber shell casing.

On March 28, 2008, Santa Clara Police Sergeant Nicolas Richards served a search warrant on Miguel's residence in Duarte, California. Sergeant Richards seized a Dell laptop computer, a copier/fax machine, a gun cleaning kit, $3,240 cash, an Airsoft gun,[FN 5] and a rifle.  In the bedroom of the residence he located identifying information for Miguel.  Sergeant Richards searched a Dodge Durango registered to Jose Chaidez; a MoneyGram receipt for $2,500 was found inside.

[FN 5:] Sergeant Richards testified that the Airsoft gun was not a real firearm.

On March 29, 2008, California Highway Patrol Officer Edward Whitfield conducted a search of Estrada's Burbank apartment. There were papers belonging to Estrada in the apartment. Officer Whitfield recovered two baggies of marijuana, a baggie of various narcotics, a book entitled "Surgical Speed Shooting," a book entitled "The Gun Digest, Book of Combat Handgunnery," and a book entitled "Hit Man A Technical Manual for Independent Contractors." In addition, Officer Whitfield found two notebooks, one purple and one gray; a black bag containing $2,000 cash; and a black baseball cap with "LA" on it, which he found hanging on a hook on the back of a door. The notebooks were marked as exhibit Nos. 92 (the purple notebook) and 93 (the gray notebook), and two pages of notes taken from exhibit No. 93 were marked as exhibit No. 91. On one of the pages inside the purple notebook the name "Chaidez" was written. In the pages of the gray notebook was a letter addressed to Estrada. One of the pages of notes taken from the gray notebook included phrases such as "surveillance," "Fast Fast Fast," "Really Fast," "military style precision," "gloves, disguise," "fake wigs," "stay calm," "calm and precise," and "shoot to kill!" Inside a black backpack, Officer Whitfield found a .45-caliber handgun and under the bed he found two different .45-caliber handguns, numerous gun magazines, and a plastic baggie containing some ammunition and a gun cleaning cloth. The next day Officer Whitfield searched Estrada's car and found two cellular telephones. No ammunition or .380-caliber handguns were found in the residence.

Criminalist Eric Barloewen from the Santa Clara County Crime Laboratory (the crime laboratory) examined the eight fired cartridge cases, two fired bullets, and the .380-caliber pistol. He testified that the Lorcin .380 pistol was the murder weapon. All the cartridge cases recovered from the scene were ejected from the recovered weapon. He explained that a fully loaded Lorcin pistol would be able to fire a total of eight rounds.

Crime laboratory employee Matthew Riles, an expert in examining physical evidence for latent prints, determined that there were no latent prints on the pistol. He explained, however, that if someone had worn gloves while using the pistol there would not be any prints. Riles was able to develop latent prints on the paper that contained the driving directions. Michael Valverde, a fingerprint examiner, was able to identify one of the prints as belonging to Cesar Chaidez, Miguel's brother, and two fingerprints belonging to Estrada.

An expert in DNA analysis examined the baseball cap recovered from the area close to 18400 Overlook and the right glove and black jacket. The major DNA profile for all three items was the same— Estrada. Garcia and Miguel were excluded as minor contributors. A gunshot residue expert testified that there were many particles of gunshot residue on the gloves.

4

On March 14, 2008, Laurie Babula lived at 18400 Overlook; she testified that 18400 Overlook Road is a complex of townhouses. At approximately 7:30 a.m. on March 14, she looked out of her bedroom window and saw a man in the parking lot dressed all in black with a black messenger bag; he was wearing a black baseball hat. When Babula left her townhouse at approximately 8:00 a.m. she saw the same man at a nearby intersection; he was looking at a newspaper. She described the man as a thin Hispanic in his twenties. A couple of weeks later she identified Estrada from a photographic lineup as the man she saw on the day of the murder.

On March 14, 2008, Joe Colonna, who runs a housecleaning business, dropped off two of his cleaners, Alma Fuentes and Alva at a townhouse—unit No. 33—on Overlook between 9:25 a.m. and 10:00 a.m. While cleaning the townhouse, Fuentes saw a young man walk back and forth outside. At approximately 10:30 a.m. she went outside to wait for Colonna. While she was waiting, she saw the man she had seen earlier walk back and forth while talking in Spanish on a cellular telephone. The man was wearing black pants, a black jacket, and a black cap; she described him as a "white Latino" between "24 and 25 or 26." Fuentes saw an older man arrive in a black car; he went into a unit that was close by. When Colonna arrived sometime between 11:00 a.m. and 11:30 a.m., she went back into the townhouse she had been cleaning with Colonna. While they were inside, Fuentes heard between "five and six" gunshots. Colonna heard the gunshots; he described the sound as "like somebody unloaded the whole gun." He and Fuentes locked the townhouse and left. When Fuentes went outside she saw the man in black running away.

Colonna testified that when he came back to the complex to pick up Fuentes and Alva around 11:30 a.m., he noticed a man standing around; he thought the man looked suspicious. Colonna saw the man from approximately 20 yards away and for approximately three seconds; he made eye contact with the man. Colonna described the man as "thin and light complexion, unshaven face, black clothes, carrying a . . . black bag." He had a black hat on. The man was about 25 years old and five feet seven inches tall. As Colonna was driving up to the complex he saw another man walking across the road, but he could not describe him. This man went into a unit close to unit No. 33. In court, both Fuentes and Colonna identified Estrada as the man in black they had seen on March 14.

Dr. Joseph O'Hara, the Santa Clara County Medical Examiner, testified that the cause of Achilli's death was "gunshot wounds of the head and torso."

*Testimony Regarding Tessa Donnelly's Relationship with Achilli and Garcia*

Tessa Donnelly met Achilli in 2004 when she was working at Mountain Charley's as a bartender; Achilli owned the bar. Donnelly dated Achilli for approximately four years, but broke up with him in September 2007 because Achilli was seeing someone else. About the same time, Achilli sold Mountain Charley's and the 180 Restaurant to Garcia and his brother, Eric. A few weeks after she

5

broke up with Achilli, Donnelly began dating Garcia. Garcia told Donnelly that he had recently ended his relationship with his fianceé. Within a month of their first date, Garcia told Donnelly that he cared a lot about her and saw their future together. Donnelly spent most weekends in Discovery Bay where Garcia had a house. Their relationship was sexual. Garcia said he wanted to marry Donnelly and have children together, but Donnelly told him he was moving too fast. Donnelly never told Garcia she loved him.

In early November 2007, Donnelly decided Garcia was too possessive; she stopped having sexual intercourse with him. On a few occasions, Donnelly saw Garcia drive by Achilli's residence. Around New Year's Day 2008, Donnelly lost her cellular telephone. Garcia said that he did not know what happened to the telephone; Donnelly had not given Garcia permission to take it.[FN 6] In January 2008, Donnelly and Achilli discussed dating again, so Donnelly told Garcia she wanted to date Achilli and not him. Around the same time Garcia demoted Donnelly from bar manager at the 180 Restaurant to bartender. Donnelly testified that she hoped to remain friends with Garcia because they had to work together. In February 2008, Donnelly went on several trips with Garcia because Achilli started seeing someone else. On these trips Donnelly did not have sexual intercourse with Garcia, but they did engage in "foreplay."

[FN 6:] On March 14, 2014, after Garcia had given the police consent to search his residence, Officer Clinton Tada located a black Dell laptop shoulder bag in which he found a blue and gray Casio cellular telephone. At trial, Donnelly identified the Casio telephone as hers.

On March 1, 2008, Donnelly went home from the restaurant at around 1:00 a.m.; she lived only two blocks away. Donnelly let Steve Wilkins, another bartender, sleep on her couch. Garcia came to her apartment uninvited.[FN 7] Garcia had been drinking so she let him sleep in her room, but they did not have sexual intercourse. Around 9:00 a.m., Donnelly heard voices. When she got up to check on who was there, Wilkins told her that Achilli had come to the apartment and asked if Garcia was there. Wilkins said that he told Achilli that he was. Donnelly grabbed her keys and rushed out of the apartment to go to Achilli's townhouse to tell him that nothing had happened. Donnelly could not remember if she spoke to Achilli later that day or the next day.

[FN 7:] Wilkins confirmed that this incident happened.

After the March 1 incident, Donnelly and Achilli talked and "figured it out." Donnelly told Garcia that she did not love him and that she loved Achilli and was getting back together with him; she told Garcia this two or three times. Garcia told her she was wasting her life and that Achilli was old and he was young. He asked her why she was choosing Achilli over him.

The weekend following the March 1 incident, Donnelly and Achilli went to San Francisco. They spent the night together and then drove back to Los Gatos in Achilli's black BMW. Achilli parked his car

in front of Donnelly's apartment. As Donnelly and Achilli were taking suitcases out of the car, Donnelly noticed Garcia drive by. Donnelly received a text message from Garcia the "gist" of which was "What are you doing? I can't believe you're with him."[FN 8]

[FN 8:] This incident occurred on March 9.

After March 9, 2008, Donnelly and Achilli went to Las Vegas for three days. They spoke about marriage. The night before the murder, Achilli spent the night at Donnelly's apartment. Achilli took Donnelly to work because her car was at his townhouse. He dropped her off at her work around 11:15 a.m. Achilli was going to go home and then he had a lunch meeting.

Donnelly testified that between January 2008 and up until the time of Achilli's murder there were more than 30 telephone calls between her and Garcia. However, early in the week immediately preceding the murder Garcia called her a lot, but she did not return the calls. During March 2008, Garcia sent her dozens of text messages; in some he accused her of lying, in others he asked to see her. In other messages he demanded to know where she was and told her she needed to choose between him and Achilli.[FN 9]

[FN 9:] The prosecutor asked Donnelly if she remembered receiving a whole series of text messages from Garcia. Although Donnelly could not remember most of them, they were read to the jury during Donnelly's testimony and the exhibits containing the text messages were admitted into evidence.

Numerous witnesses testified about the relationship between Garcia and Donnelly. Joey Battiato worked for Garcia, first at Pacific Blue Equity, a mortgage company, and then as a bartender at Mountain Charley's. Battiato had known Donnelly since high school. When he heard that Mountain Charley's and the 180 Restaurant were for sale he asked Garcia if he was interested in buying them. Achilli paid Battiato a $25,000 finder's fee and promised him $25,000 more when the final sales price was paid off.

For a couple of months Battiato and Garcia shared an apartment in Los Gatos. In January 2008, Garcia became upset that Donnelly was avoiding him. Garcia thought that Donnelly was seeing Achilli again. Garcia told Battiato that Donnelly had lied to him about being out of town when she was not. On numerous occasions Garcia asked him to check to see if Donnelly's car was parked at Achilli's townhouse. Late in February 2008, after Garcia and Donnelly took trips together to Portland and Las Vegas, Garcia thought that he and Donnelly were successfully back together. Garcia told Battiato about the incident when Achilli came to Donnelly's apartment and Donnelly chased after Achilli. Garcia could not understand Donnelly's attraction to Achilli.

On March 9, 2008, Battiato saw Donnelly and Achilli together in front of her house; they were removing suitcases from Achilli's car. Garcia said, "She's busted, hah. Caught her." Garcia told Battiato that he had other people checking on Donnelly's movements. Battiato testified that at least 50 percent of the telephone

conversations he had with Garcia were about Donnelly. Garcia repeatedly asked him to check on Donnelly's whereabouts. Garcia told him that he checked Donnelly's telephone for text messages from Achilli. According to Battiato, Garcia threatened Achilli; he said things such as "I know people that will take care of it" and that he would "have to send flowers to the funeral or plan his funeral . . . ." Garcia stated that they could make it look as if it was a drug deal "gone bad." Garcia threatened Battiato that if he said anything, "something bad" could happen to him or his son. Garcia's threats frightened Battiato. At one point when the comments about Achilli escalated, Battiato told Garcia "Don't do it. Don't talk to me about these things." Garcia told him that he was a "graduate of USF, VP of Hewlett Packard and Phillips, Bellarmine football coach" and that the "cops would talk to him for about five minutes and they'd be on their way." Initially, Battiato did not tell the police about Garcia's threats to Achilli because Battiato was unsure if he was an accomplice. Two days after the murder, Garcia told Battiato not to tell the police that he had driven by Achilli's house.

Francis Ogbogu, Garcia's business associate, knew that Garcia was dating Donnelly and that Donnelly had dated Achilli. Before March 6, 2008, he and Garcia had conversations about Garcia's relationship with Donnelly. At one point, Garcia told him that he would probably marry Donnelly; at another point Garcia told him that the relationship was "weird." Garcia told him about the time he spent the night at Donnelly's apartment and Achilli came to the door. Garcia thought the whole thing was strange because he was dating Donnelly. Ogbogu told Garcia to confront Donnelly. On March 6, 2008, Ogbogu received a text message from Garcia, which said "She denied everything."

Kristen Rush, one of Garcia's ex-girlfriends, said that Garcia had told her that his girlfriend was seeing someone else and that he had driven by the house of the girlfriend's ex-boyfriend where he saw her car.[FN 10] Garcia appeared "upset." This happened sometime in February. Between January 2008 and the day of Achilli's murder, Rush talked to Garcia about the "situation" with his girlfriend but it was not "a lot." However, they did talk about other incidents that had happened with his girlfriend; he told Rush that he thought his girlfriend was with the man who used to own the bar. Garcia talked to her about his girlfriend not returning his telephone calls.

[FN 10:] Rush did not know the name of the girlfriend, but Garcia told her he thought his girlfriend was seeing the previous owner of Mountain Charley's.

Trevor Kozacek, a bartender at Mountain Charley's, told a similar tale—Garcia told him he was dating Donnelly. In the beginning the relationship was good, but then Garcia expressed concern that Donnelly was seeing Achilli. Garcia asked Kozacek to check on Donnelly's whereabouts. Garcia told him he wanted Achilli to come to the bar while Donnelly was there so he could see Donnelly's reaction.

Kristina Wilkins worked at the 180 Restaurant; she had known Donnelly since 2006. Garcia told her about his relationship with

8

Donnelly; he said he really liked her and he could picture having children with Donnelly. Garcia appeared to be in love with Donnelly; Kristina described it as "super-infatuated." However, Donnelly "did not seem as into it as he was."

Wilkins met Garcia when Garcia took over ownership of Mountain Charley's. Again, Garcia said he was dating Donnelly and wanted to marry her. However, Garcia told Wilkins that he had gotten into a fight with Donnelly because she had lied to him. Garcia said that Donnelly's car was at Achilli's house. Garcia did not like Donnelly seeing Achilli, and he continued to pursue her. After the incident where Achilli came to Donnelly's apartment while Garcia was there, Wilkins told Garcia to let Donnelly go. Garcia said, "It's over but it's not over, if you know what I mean." Wilkins did not know what Garcia meant.

Lorene Novoa had known Garcia since eighth grade. In October 2007, Garcia told her that he was dating Donnelly. Later, Garcia told her that he thought Donnelly was seeing someone else because she stopped having sexual intercourse with him; he thought that Donnelly was going back to her old boyfriend. Novoa told Garcia not to drive by Donnelly's apartment as it could be considered stalking.

Robert Orner, who became the manager of the 180 Restaurant in February 2008, testified that about a week before Achilli was killed, he went to Santa Cruz with Garcia, Brad Tarter, and Battiato; Garcia was distant.

Nick Lezotte, who had known Garcia since high school, stated that one night Garcia called him at 1:00 a.m. to pick him up at Mountain Charley's. Lezotte drove Garcia to an address on Meridian Avenue where Donnelly was supposed to be at a dinner party; Garcia identified a black BMW there as belonging to Achilli.

In January 2008, Nome Wynn came to Los Gatos and stayed at Battiato's apartment. Garcia was there and he talked about putting a tracking device on a vehicle. Garcia said he thought his girlfriend was lying to him and seeing an old boyfriend; Garcia described him as "an old guy." Garcia became agitated when he was unable to reach Donnelly. Garcia left the apartment three or four times that night to check on Donnelly; he asked Battiato to go as well. In early February, Wynn returned to Los Gatos to talk to Garcia about buying the bar and restaurant. Garcia and Wynn left Battiato's apartment to discuss the purchase. Garcia started talking about his problems with Donnelly. As they were on their way to have a beer, Garcia tried to reach Donnelly on the telephone, but without success. Garcia asked Wynn to drive him to Achilli's townhouse to look for a dark BMW. Garcia wanted to know if Donnelly's car was there, but they did not see either car. Garcia had told Wynn that Donnelly was supposed to be at a family dinner in San Francisco, but he had concerns that Donnelly was lying to him. After they left Achilli's townhouse, Garcia told Wynn to drive by the house belonging to Donnelly's mother, but there were no cars there. When they went to a bar called Carry Nations they ran into Donnelly's brother. Garcia asked him about the family dinner in San Francisco.

9

Donnelly's brother said, "What dinner? I've been drinking all night here." Garcia became visibly upset; he was pacing back and forth. Garcia tried to telephone Donnelly about five or six times, but the telephone went to voicemail. Garcia told Wynn that Donnelly was probably with Achilli. Wynn went with Garcia to Donnelly's apartment, where Garcia retrieved a key from under a rock and let himself in. He searched under Donnelly's bed for her make-up bag. Garcia said that if the make-up bag was not there Donnelly was probably out of town.

Garcia's friend Ali Aminigohar went to Las Vegas with Garcia, Donnelly, and another friend in February 2008. Garcia told Aminigohar that Achilli had come to Donnelly's apartment when he was there. Garcia said, "He doesn't know who he is fucking with."

Garcia contacted Amanda Freel, a licensed private investigator in January 2008. Garcia stated that he wanted his girlfriend followed because he believed she was seeing Achilli. Freel prepared a contract for her services, but Garcia never signed it.

*Daniel Chaidez's Testimony*

On December 2, 2008, pursuant to a plea agreement, Daniel Chaidez (Daniel) pleaded guilty in this case to voluntary manslaughter, vicarious arming, solicitation to commit murder, and accessory to commit murder. Daniel agreed to be sentenced to 12 years, eight months in prison. The terms of the plea agreement included the following statement: "That early in the investigation of Mark Achilli's murder, Daniel Chaidez . . . contacted the police, drove himself to the police department where he ultimately described the circumstances surrounding Mark Achilli's murder, and fully cooperated with detectives. Daniel Chaidez's cooperation greatly assisted the investigation and led to the arrest of other defendants." Daniel agreed to "testify in a truthful, detailed, complete, and candid manner in any future proceedings concerning the circumstances surrounding the murder of Mark Achilli on March 14, 2008."

Daniel testified that he first met Garcia in the latter part of 2005 and he began working for Pacific Blue Equity in 2006. In October 2007, he started working for Garcia as a doorman at Mountain Charley's. Daniel barely knew Donnelly, and he did not know Achilli. In January 2008, Garcia asked him if he "knew anyone who could get rid of a problem." Daniel told him that he would "inquire." Daniel telephoned his cousin Miguel; he told Miguel that someone he knew had a problem. Miguel asked him what sort of problem and Daniel told him a person. Daniel thought he asked Miguel if he knew someone who could get rid of a problem and Miguel said he would find out and call him back. Miguel called him within a few days and Daniel told Garcia "it was possible." Garcia set a price ceiling of $10,000. Daniel talked to Miguel to find out how much it would cost; initially, Miguel said $10,000. After some haggling Miguel agreed on $9,000; Daniel told Garcia it would be $9,500—Daniel anticipated that he would have some expenses.

From March 1, 2008 to March 15, 2008, there were 43 telephone calls between Daniel and Miguel. Garcia told Daniel to go to a

metroactive Web site and key in 180 Club or Mountain Charley's. Daniel found Achilli's photograph and then he told Miguel how to navigate the Web site to get Achilli's photograph.

On March 11, 2008, Garcia gave Daniel $4,000 for the murder; he told Daniel he "wanted this shit done." During February, Garcia had given Daniel a piece of paper with a street address, unit address, APN [assessor's parcel number], city, and zip code. Garcia told Daniel that Achilli drove a dark 6 series BMW, and Daniel told Miguel about the car. Garcia asked if the gun would have a silencer, but Daniel was not able to tell Garcia what sort of gun would be used. Several times, Garcia suggested that it should look as if it was a drug deal "gone bad" or that drugs were involved. Garcia and Daniel discussed the fact that Garcia might be a suspect, but Garcia said that it would "just blow over." Garcia indicated that he wished the murder could have happened on Valentine's Day weekend, and that he wanted the body left at the house. Garcia said that it would be best if there were no witnesses, and if Donnelly was there she should be killed.

On March 12, 2008, Daniel wired $2,500 to Miguel. Miguel confirmed that he had received the money. Daniel spoke with Garcia on the telephone both before and after the wire transfer. Renee Kelso, a cashier at Longs Drugs, confirmed that she had prepared a MoneyGram for $2,500 on March 12, 2008, at approximately 6:15 p.m. The man who had purchased the MoneyGram provided identification, but Kelso could not recall the name.

On March 13, 2008, Garcia gave Daniel $5,500 in cash in a brown paper bag. Daniel telephoned Miguel and told him he had all the money. Later Miguel telephoned Daniel to tell him the shooter was en route.

On March 14, 2008, a few minutes before noon, Miguel called Daniel to tell him that the mission was accomplished. Daniel agreed to meet Miguel to give him the remaining $6,500. The location of the meeting changed, but eventually they met at a gas station near Highway 152 and Highway 5, where Daniel gave Miguel the remaining money. Daniel testified that he did not know why he helped Garcia arrange Achilli's murder.

Daniel spoke to the police twice after the murder, once on March 24 and once on March 27. Daniel freely admitted that he had lied to the police in the first interview. However, in the March 27 interview he told the police that he feared for his safety. Initially he again lied to the police about why he had wired money to Miguel in order to avoid incriminating Miguel. However, in this interview he told the police that Garcia wanted Achilli killed and that he had spoken to Miguel about finding someone to take care of the problem. At the end of the interview, Daniel was arrested for murder. It was not until many months later that there was a negotiated settlement for Daniel to plead guilty to lesser charges in exchange for his testimony.

*Miguel's Confession*[FN 11]

On March 28, 2008, Los Gatos Police Sergeant Matt Frisby interviewed Miguel. The police read Miguel his *Miranda*[FN 12] rights. Miguel said that his cousin Daniel called him in February 2008 and asked him if he could arrange to have someone "taken care of." Miguel said that he understood this to mean to kill someone. Miguel said that he and Daniel agreed on a price of $9,500. Later, Daniel told Miguel how to access a Web site with a photograph of Achilli. Miguel said he found the photograph of Achilli which had a 180 logo on it. Miguel printed out the photograph and gave it to someone he knew. Miguel said he got a wire transfer of $2,500 before the murder. On March 13 he met someone and gave him $1,500 cash, the victim's photograph, and the victim's address on Overlook Drive. Miguel said he met with Daniel on March 15 and Daniel gave him $6,500 cash. Miguel said he drove back to Southern California. Miguel wrote a confession on March 28, 2008. In his confession he wrote, "I called Dan to let him know right after." Miguel told police that Daniel put a maximum price of $10,000 for the murder. Miguel said that "tak[ing] care of" someone meant killing someone.

[FN 11:] Miguel's recorded confession was not played for the jury. The confession came into evidence through the testimony of Sergeant Frisby and through a redacted copy of Miguel's written confession, which made no mention of Estrada.

[FN 12:] *Miranda v. Arizona* (1966) 384 U.S. 436.

*Examination of Computer Hard Drives and Cellular Telephones*

San Jose Police Sergeant Alan Lee, a computer forensic analysis expert, examined a forensic copy of a computer hard drive in April 2008. There were two user accounts: Paul Garcia and guest. Garcia was the registered owner of the computer. Under the login name Paul Garcia, a photograph of Achilli next to a 180 logo was placed on the computer on January 7, 2008. The computer had Google searches for "Mark Achilli pictures" and for private investigators, vehicle tracking devices, and GPS tracking devices.

Sergeant Lee examined a second computer with the e-mail address of danielchaidez@pacificblueequity.com. This computer had a link to the 180 Restaurant Web site that contained Achilli's photograph. This was the same photograph that was on Garcia's computer. The person using this computer accessed the photograph on March 11, 2008.

The police obtained telephone records for Achilli, Donnelly, Garcia, Daniel, Miguel, Estrada, and a Robert Jacome.[FN 13] According to the records, Daniel and Miguel telephoned each other repeatedly on March 14, 2008. On the morning of the murder, Miguel telephoned Estrada at 9:58 a.m., Daniel at 11:24 a.m., and again at 11:42 a.m., and Estrada again at 11:30 a.m. Estrada telephoned Miguel at 11:07 and 11:39 a.m. This call was picked up by the Los Gatos cellular tower; in addition, Estrada called Jacome at 11:38 a.m. Daniel telephoned Miguel at 11:26 a.m. and after the 11:42

a.m. telephone call from Miguel, Daniel telephoned Miguel twice within two minutes. Estrada telephoned Miguel again at 11:45 a.m. and then Miguel telephoned Daniel at 11:46 a.m. Daniel returned Miguel's telephone call within a minute. At 11:57 a.m. Miguel telephoned Estrada again. On the afternoon of the murder when Miguel telephoned Estrada at 4:08 p.m. and again at 4:14 p.m., the telephone call connected to a cellular tower in Southern California. At 4:50 p.m. Daniel telephoned Miguel; Miguel immediately returned his call.

[FN 13:] Robert Jacome testified at the preliminary examination in this case. He said that he drove Estrada from Southern California to Northern California on March 13, 2008, they stayed in a hotel that night. The next morning, he drove Estrada to somewhere off Highway 9. Later that morning, he received a telephone call from Estrada during which Estrada sounded panicked and told Jacome to pick him up. When Jacome saw Estrada again he was running toward Jacome's car. Estrada was wearing different clothes. Jacome did not testify at the trial.

The telephone calls between Daniel and Miguel continued on March 15, the day after the murder. Specifically, Daniel telephoned Miguel at 3:50 p.m., 4:30 p.m., and 4:40 p.m.; the telephone calls connected to a cellular tower in Gilroy. At 5:30 p.m. Daniel telephoned Miguel; the telephone call connected to a cellular tower in Hollister. A 6:00 p.m. telephone call from Daniel to Miguel connected to a cellular tower at Bell Station. Between January 4 and February 11, 2008, there had been only nine telephone calls between Daniel and Miguel, and from February 12 to March 11, 2008, there were no telephone calls between the two men. From March 11 to March 15, 2008, there were 43 telephone calls between Daniel and Miguel.

As to telephone calls between Daniel and Garcia, there were eight calls between January 1 and January 31, 2008. In February the number increased to 26, and from March 1 to March 13 there were 37 telephone calls.

*Bank Records*

The custodian of records for Bank of America reviewed Garcia's bank records. The bank requires two forms of identification for cash withdrawals. The driver's license number and social security number utilized for withdrawals belonged to Garcia. On March 13, 2008, Garcia withdrew $1,500 cash from his personal account. On February 22, 2008, Garcia withdrew $2,000 cash from the Mountain Charley's savings account and the same amount on March 13, 2008. On March 13, 2008, Garcia withdrew $2,000 cash from the 180 Restaurant account. On March 14, 2008, he withdrew $1,400 from the 180 Restaurant account. There were ATM withdrawals from the 180 Restaurant account on March 6 and March 12, 2008, totaling $4,000.

A forensic accountant reviewed Garcia's financial records from March 2007 until April 2008. There were no big cash withdrawals from Garcia's personal account during that timeframe, before he withdrew the $1,500 on March 13, 2008. The accountant confirmed

the cash withdrawals of $2,000 from the Mountain Charley's account on February 22 and March 13. These were the only cash withdrawals from that account. The $2,000 withdrawn from the 180 Restaurant account on March 13 was the only cash withdrawal from the account between February 21 and March 20, 2008. For March 13, 2008, from Garcia's checking account, the Mountain Charley's account, and the 180 Restaurant account, a total of $5,500 was withdrawn. As to the 180 Restaurant ATM account there were regular withdrawals approximately every six or seven days for at least the month of February in the amount of $4,000. However, as to Garcia's checking account, the Mountain Charley's account, and the 180 Restaurant expense account cash withdrawals were rare.

The forensic accountant examined Daniel's bank account for the period March 2007 through July 2008. From April 2007 until April 2008, the highest opening balance was $587.34; during that period, five months had negative balances, and the largest cash withdrawal was $490.

*Garcia's Testimony*

Garcia testified in his own defense that he did not hire Daniel to arrange Achilli's murder or give him $9,500; that he had nothing to do with Achilli's murder and never asked anyone to harm him; that he had never met Estrada, Miguel or Jacome; and that although he had a relationship with Donnelly, he was not jealous of Achilli's and Donnelly's relationship.

Garcia admitted that he drove past Donnelly's apartment many times, but he explained that taking the route past her apartment to Highway 9 was quicker than taking main streets.

Garcia's explanation for the withdrawal of a large amount in cash during the week before the murder was that he was expecting a large crowd for the Saint Patrick's Day weekend and he needed to put cash into the ATM machine. Also, he had to pay the janitor, buy pizza to serve during the busy weekend, make change, give Battiato $500 to buy 10 Saint Patrick's Day tickets for a party at another restaurant, pay approximately $1,000 in cash to the installer of a security system, and pay out the waitresses and bartenders for tips each night.

As to his numerous telephone calls to Daniel during the week before Achilli's murder, Garcia said that Daniel was responsible for handling the telephone calls that came in as a result of a Spanish language radio commercial that Pacific Blue Equity was running.[FN 14] Garcia said that he would frequently telephone Daniel to find out if any telephone calls had come in and make sure that Daniel would follow up on the telephone calls.

[FN 14:] At one point during his testimony Garcia said that during March 2008 he was in the process of closing Pacific Blue Equity; the lease on the building ended on April 1, 2008.

When he heard that Achilli had been killed, Garcia went to the police station; he consented to searches of his house and automobile. On cross-examination Garcia admitted that during his police

14

interview he lied to the police.

*Garcia*, 2015 WL 917801, *1-10 (brackets added).

### B.    Procedural History

Petitioner, Garcia, and Miguel appealed the judgment to the California Court of Appeal.  In an unpublished opinion, filed on March 2, 2015 and modified on March 20, 2015, the state appellate court affirmed the judgment.  *Garcia*, 2015 WL 917801, *1; Resp't Ex. 14.  On June 17, 2015, the California Supreme Court summarily denied their petition for review.  Dkt. 1-6 at 2.

On May 25, 2016, Petitioner filed a petition for a writ of habeas corpus in the instant matter.[6]  Dkt. 1.

On October 7, 2016, this Court issued an order directing Respondent to show cause why the writ should not be granted.  Dkt. 5.  Respondent has filed an Answer to the petition.  Dkt. 10. Petitioner has not filed a Traverse, and the time frame for doing so has passed.  The matter is fully briefed and ripe for adjudication.

## II.    LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v.*

---

[6] Meanwhile, Miguel and Garcia filed separate federal habeas actions on July 21, 2015 and September 15, 2016, respectively.  *See Chaidez v. McDowell*, Case No. C 15-03367 WHO (PR) & *Garcia v. McDowell*, Case No. C 16-05301 BLF (PR).  On May 13, 2016, the Honorable William H. Orrick denied Miguel's petition as to all claims and issued judgment.  *See* Dkts. 22, 23 in Case No. C 15-03367 WHO (PR).  On January 20, 2017, the Honorable Beth Labson Freeman granted Garcia a stay pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005) in order for him to exhaust his state judicial remedies as to certain claims.  *See* Dkt. 22 in Case No. C 16-05301 BLF (PR).

*Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, s*ee Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of section 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of section 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Even if constitutional error is established, habeas relief is warranted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson*, 532 U.S. 782, 795-96 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). In applying the above standards on habeas review, this Court reviews the "last reasoned decision" by the state

16

court. *See Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). Specifically, when there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). Thus, a federal court will "look through" the unexplained orders of the state courts rejecting a petitioner's claims and analyze whether the last reasoned opinion of the state court unreasonably applied Supreme Court precedent. *See Ylst*, 501 U.S. at 804-06; *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). The last reasoned decision in this case is the state appellate court's unpublished disposition issued on March 2, 2015 and modified on March 20, 2015 (with no change in judgment), in which that court considered Claims One through Seven from the instant petition. *See* Resp't Exs. 14, 15; *Garcia*, 2015 WL 917801, *10-43.

## III.     DISCUSSION

As an initial matter, the Court notes that prior to discussing his claims, Petitioner alleges that he is "innocent of the murder of Mark Achilli," and that "his claim of innocence is procedural." Dkt. 1-1 at 16. The United States Supreme Court has not clearly established that freestanding claims of actual innocence in non-capital cases are cognizable on federal habeas corpus review. *See Herrera v. Collins*, 506 U.S. 390, 400-01 (1993); *see also House v. Bell*, 547 U.S. 518, 555 (2006); *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 71 (2009) ("Whether such a federal right [to be released upon proof of actual innocence] exists is an open question. We have struggled with it over the years, in some cases assuming, arguendo, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet."). Just recently, the Ninth Circuit observed that it is "still an open question" whether federal habeas relief is available based on a freestanding claim of actual innocence. *Taylor v. Beard*, 811 F.3d 326, 334 (9th Cir. 2016) (en banc) (citing *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013)). Given the lack of a holding from the Supreme Court that there is a constitutional right to release based upon a showing of actual innocence, a state court's rejection of such a claim could not be said to be "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28

U.S.C. § 2254(d)(1). Thus, to the extent that Petitioner is raising a freestanding actual innocence claim, such a claim is DISMISSED.

The Court shall now resolve the remaining seven claims from the petition below.

### A. Failure to Give Accomplice Instructions as to Garcia and Miguel (Claim One)

Petitioner alleged a violation of his federal constitutional rights based on the trial court's failure to instruct the jury to determine whether Garcia and Miguel were accomplices and if so, that it should consider their testimony and/or statements with caution and rely on them only if corroborated. Dkt. 1-1 at 21-24; Dkt. 1-2 at 39-52.

### 1. State Court Opinion

The state appellate court described the factual background on this claim and rejected it as follows:

> Penal Code section 1111 provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." Under Penal Code section 1111, "An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

> In this case, the trial court instructed the jury that if they found a murder had been committed, Daniel was an accomplice as a matter of law, that the jury could not convict any of the defendants based on the testimony of an accomplice alone, and that any accomplice testimony should be viewed with caution.[FN 15] Estrada contends that the trial court was required to give accomplice instructions regarding Garcia and Miguel.

> [FN 15:] The court instructed the jury pursuant to CALCRIM No. 335—no dispute whether a witness is an accomplice.

> When an accomplice is called to *testify by the prosecutor or the defendant*, the trial court has a sua sponte duty to provide cautionary instructions to the jury stating that to the extent the testimony tends to incriminate the defendant it cannot alone be used to convict but requires corroboration, and it should be viewed with caution. (*People v. Guiuan* (1998) 18 Cal. 4th 558, 569 (*Guiuan*); see *People v. Howard* (2008) 42 Cal. 4th 1000, 1021-1022; *People v. Zapien* (1993) 4 Cal. 4th 929, 982; CALCRIM No. 334.) The rationale for requiring the cautionary instructions is that to "the extent an accomplice testifies on behalf of the prosecution, the testimony is subject to the taint of an improper motive, i.e., that of promoting his or her own self interest by inculpating the defendant." (*Guiuan, supra*, at p. 568.) However, when an accomplice is a *codefendant*

*who testifies on his or her own behalf*, different rules may apply because of the potential for prejudice to the codefendant's case. (*People v. Terry* (1970) 2 Cal. 3d 362, 398-399 (*Terry*), overruled on other grounds in *People v. Carpenter* (1997) 15 Cal. 4th 312, 381.)

When a codefendant/accomplice takes the stand on his or her own behalf and implicates the defendant while also *admitting his or her own guilt*, the courts have concluded that the normal rule triggering the sua sponte duty to instruct on the cautionary principles should not apply. (*Terry, supra*, 2 Cal. 3d at p. 399.) In this circumstance, there is no potential for prejudice to the codefendant's case because he or she has effectively confessed guilt. (*Ibid.*) In contrast, the California Supreme Court has declined to impose the sua sponte duty when a testifying codefendant implicates the defendant but *denies his or her own guilt*, reasoning that this is a matter for the trial court's discretion because the "court may properly conclude that the giving of accomplice instructions might improperly prejudice the codefendant's case." (*People v. Ramos* (1982) 30 Cal. 3d 553, 581-582 (*Ramos*)[FN 16]; *Terry, supra*, at pp. 398-399; *People v. Catlin* (1959) 169 Cal. App. 2d 247, 255 [it might subject the codefendant to unfair prejudice in the eyes of the jury to give even a limited instruction on accomplice testimony].)

[FN 16:] The United State Supreme Court granted certiorari and ultimately reversed the judgment of Ramos in *California v. Ramos* (1983) 463 U.S. 992 on other grounds.

In more recent cases, the California Supreme Court has concluded that even when a codefendant/accomplice testifies on his or her own behalf and denies guilt, the trial court is required to give the cautionary instructions *upon request* by a defendant, reasoning that "just as in the case of an accomplice called to testify by the prosecution, [the codefendant's] testimony was 'subject to the taint of an improper motive . . . .'" (*People v. Box* (2000) 23 Cal. 4th 1153, 1209, overruled on another ground in *People v. Martinez* (2010) 47 Cal. 4th 911, 948, fn. 10; see *People v. Avila* (2006) 38 Cal. 4th 491, 562.) However, our high court has not expressly overruled its earlier decisions in *Terry* and *Ramos* declining to impose a *sua sponte* duty when the testifying codefendant denies his or her guilt. (See *People v. Smith* (2005) 135 Cal. App. 4th 914, 928.)

Here, Garcia testified on his own behalf and denied guilt; further, he did not in any way implicate Estrada. Accordingly, under our high court's holdings in *Terry* and *Ramos*, Estrada's contention that the trial court had a sua sponte duty to provide the cautionary instructions as to Garcia is unavailing.

As to Miguel's confession, Estrada's counsel entered into an agreement with the prosecution that Miguel's confession be redacted so as not to implicate Estrada. The redactions and limitations that the parties agreed to eliminated the need for an accomplice instruction.

Even if we were to assume for the sake of argument that the trial

19

United States District Court
Northern District of California

court should have sua sponte provided the cautionary instructions with regard to Miguel's testimony, the failure to do so was not prejudicial. The failure to give accomplice instructions is harmless if there is sufficient corroborating evidence in the record. (*People v. Avila*, *supra*, 38 Cal. 4th at p. 562.) The corroborating evidence must tend to connect the defendant with the crime without aid or assistance from the accomplice's testimony; however, the corroborative evidence may be slight, may be entitled to little consideration when standing alone, and need not establish all the elements of the crime. (*Id.* at pp. 562-563; *People v. Williams* (2013) 56 Cal. 4th 630, 678-679.) Here, there was ample corroborating evidence connecting Estrada to the crime independent of Miguel's testimony. The telephone records, the three eyewitness identifications, the items belonging to Estrada found near the crime scene, Estrada's fingerprints on the directions to Achilli's residence, gunshot residue on Estrada's gloves recovered from near the crime scene, and the cash found in the black bag recovered from Estrada's residence all connected Estrada to the crime.

Estrada argues that virtually all the evidence of premeditation or planning for the murder came from Miguel and Daniel; and there was insufficient corroboration of their testimony and statements regarding that planning or premeditation. We disagree. Three types of evidence indicate premeditation and deliberation: facts about how and what the defendant did before the killing, which indicate planning; facts about the defendant's prior relationship or conduct with the victim from which a motive to kill may be inferred; and facts about the manner of the killing from which a preconceived design may be inferred. (See *People v. Anderson* (1968) 70 Cal. 2d 15, 26-27.) The fact that Estrada came from Southern California and had the directions to Achilli's residence, coupled with the eyewitness testimony that placed him at the scene well before Achilli arrived, plus the manner of the killing and location of the crime, provided ample corroborating evidence that this was a premeditated murder. The number of shots fired into Achilli indicated premeditation and deliberation—that is, "the manner of killing was so particular and exacting that [Estrada] must have intentionally killed according to a 'preconceived design' to take his victim's life." (*Id.* at p. 27, italics omitted.)

Alternatively, Estrada argues that there was insufficient corroboration of the murder-for-hire special circumstance and the lying-in-wait special circumstance. Again, we disagree. The cash found in the black bag at Estrada's residence corroborated the special circumstance of murder for hire.

As to the lying-in-wait special circumstance, a person commits a murder by means of lying in wait if he or she conceals his or her purpose from the person killed, he or she waits and watches for an opportunity to act, and then from a position of advantage he or she makes a surprise attack on the person killed. (CALCRIM No. 728.) Estrada placed himself in a position where he knew that he would encounter Achilli. The fact that Estrada was seen well before the actual murder by Babula not only in the parking lot of the Overlook Road complex but also at the stop sign reading a newspaper, and by Fuentes walking back and forth in the Overlook complex while

talking in Spanish on a cellular telephone, supports the inference that Estrada was waiting for an opportunity to kill Achilli. We find sufficient corroboration for both special circumstance allegations. Accordingly, we find any assumed error harmless.

*Garcia*, 2015 WL 917801, *10-12.

## 2. Applicable Federal Law

A determination that a reasonable likelihood exists that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred. *Calderon v. Coleman*, 525 U.S. 141, 146 (1998). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Duckett v. Godinez*, 67 F.3d 734, 745 (9th Cir. 1995).

"Even if there is some 'ambiguity, inconsistency, or deficiency' in [a jury] instruction, such an error does not necessarily constitute a due process violation." *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009) (quoting *Middleton v. McNeil*, 541 U.S. 433, 437 (1977)). "Rather, the defendant must show both that the instruction was ambiguous and that there was "'a reasonable likelihood'" that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Waddington*, 555 U.S. at 190-91 (quoting *Estelle*, 502 U.S. at 72 (internal quotation marks and citation omitted); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some [constitutional right].'").

The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *Walker v. Endell*, 850 F.2d 470, 475-76 (9th Cir. 1987) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155).

If an error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, *see Brecht*, 507 U.S. at 637, before granting relief in habeas proceedings. *Calderon*, 525 U.S. at 146-47. Under AEDPA, a federal habeas court need not determine whether the state court's harmlessness determination on direct

review (which is governed by the "harmless beyond a reasonable doubt" test set forth in *Chapman v. California*, 386 U.S. 18, 24 (1967)) was contrary to or an unreasonable application of clearly established federal law. *Fry v. Pliler*, 551 U.S. 112, 119-20 (2007); *Brecht*, 507 U.S. at 637 (on collateral review, the *Chapman* "harmless beyond a reasonable doubt" standard of prejudice must give way to the less onerous standard of whether the error had a substantial and injurious effect or influence in determining the jury's verdict. However, no case forbids use of the *Chapman* test, and a number of Ninth Circuit cases have used it. *See, e.g.*, *Ponce v. Felker*, 606 F.3d 596, 606 (9th Cir. 2010) (finding no prejudice under *Chapman* and *Brecht*); *Medina v. Hornung*, 386 F.3d 872, 878 (9th Cir. 2004) (in applying the "unreasonable application" clause of section 2254(d)(1), habeas court may determine whether state court's harmless error analysis under *Chapman* was objectively unreasonable).

### 3. Analysis

As part of its evaluation of Petitioner's instructional error claim, the state appellate court determined that accomplice instructions were not required under state law as to Garcia and Miguel. *See Garcia*, 2015 WL 917801, *10-13. Under California law, a "conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense." Cal. Penal Code § 1111. "An accomplice is . . . one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." *Id.* A state court's interpretation of state law, including the state law requirement relating to accomplice liability under California Penal Code § 1111,[7] binds a federal court sitting in habeas corpus. *See*

---

[7] California Penal Code § 1111 is a state law requirement, which is "not required by the Constitution or federal law." *Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000); *see also Cummings v. Sirmons*, 506 F.3d 1211, 1237 (10th Cir. 2007) (no constitutional requirement that testimony of an accomplice-witness be corroborated); *Foster v. Ward*, 182 F.3d 1177, 1193 (10th Cir. 1999) (same); *Harrington v. Nix*, 983 F.2d 872, 874 (8th Cir. 1993); *Brown v. Collins*, 937 F.2d 175, 182 n.12 (5th Cir. 1991). Furthermore, due process does not restrict the use of accomplice testimony. *See United States v. Augenblick*, 393 U.S. 348, 352 (1969) ("When we look at the requirements of procedural due process, the use of accomplice testimony is not catalogued with constitutional restrictions"); *United States v. Lopez*, 803 F.2d 969, 973 (9th Cir. 1986) ("The uncorroborated testimony of an accomplice is enough to sustain a conviction unless the testimony is incredible or unsubstantial on its face.").

*Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Hicks v. Feiock*, 485 U.S. 624, 629 (1988). Therefore, the state appellate court's implicit determination—that accomplice instructions were not required under state law as to Garcia and Miguel—is binding on this Court. *See Bradshaw*, 546 U.S. at 76; *Hicks*, 485 U.S. at 629.

In any event, the state appellate court was objectively reasonable in finding that any error was harmless. *See Garcia*, 2015 WL 917801, *12-13. Given the evidence at trial and the prosecution's theory of the case, which showed that sufficient corroborating evidence existed in the record showing that Petitioner executed Achilli's murder with premeditation and deliberation, any instructional error did not have a substantial or injurious effect or influence in determining the jury's verdict under *Brecht*. Accordingly, Petitioner is not entitled to habeas relief on this claim, and Claim One is DENIED.

### B.   Claims Relating to Improper Admission of Evidence (Claims Two-Four)

In the next three claims, Petitioner alleges that the trial court erred in admitting the following evidence found in the search of his residence: (1) three firearms—not used in the murder (Claim Two); (2) three books (Claim Three); and (3) handwritten notes (Claim Four). Dkt. 1-1 at 24-32; Dkt. 1-2 at 53-82.

### 1.   Applicable Federal Law

A federal writ of habeas corpus will not be granted for an erroneous admission of evidence unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986). Evidence violates due process only if "there are no permissible inferences the jury may draw from the evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). Evidence must "be of such quality as necessarily prevents a fair trial" for its admission to violate due process. *Id.* (quoting *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir. 1986)). Notwithstanding the above, the Ninth Circuit has observed that:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional

> errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

*Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (internal citation omitted) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established federal law under section 2254(d)). Therefore, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Id.* (quoting 28 U.S.C. § 2254(d)). In addition, the Supreme Court has left open the question of whether admission of propensity evidence violates due process. *Estelle*, 502 U.S. at 75 n.5; *see also Alberni v. McDaniel*, 458 F.3d 860, 866-67 (9th Cir. 2006) (recognizing that the Supreme Court has expressly concluded that whether a petitioner's due process right is violated by the admission of propensity advice is an "open question").

Finally, the failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Jammal*, 926 F.2d at 919. While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated. *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983). The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995). But only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. *See Jammal*, 926 F.2d at 920.

### 2. State Court Opinion Relating to Claims of Improper Admission of Evidence

#### a. Admission of Evidence of Firearms Not Used in Murder (Claim Two)

Petitioner claims a violation of his federal constitutional rights based on the admission of evidence that three firearms—not used in the murder—were found in the search of his residence. Dkt. 1-1 at 24-28; Dkt. 1-2 at 53-59. The state appellate court described the factual background on

24

this claim and rejected it as follows:

> Estrada contends that the trial court erroneously permitted the prosecution to introduce evidence that three firearms were found in the search of his residence. He points out that Achilli was shot with a Lorcin .380 handgun and eight .380 expended shell cases were found near the body. Further, there was no evidence of any other firearm involved in the murder or any other caliber of ammunition used.

> The People counter that the record does not establish that Estrada's counsel objected to Officer Whitfield's testimony regarding the guns he found in Estrada's residence. Further, Estrada's counsel cross-examined the officer and established the absence of any .380 firearms or ammunition in the residence. Accordingly, the People assert that Estrada has forfeited this issue on appeal.

> The first question we must answer is whether Estrada preserved this issue for review. "'"[Q]uestions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal."' [Citation.]" (*People v. Waidla* (2000) 22 Cal. 4th 690, 717.)

> At the end of Officer Whitfield's testimony Estrada's counsel asked the court to read a stipulation regarding items found in Estrada's residence and "note that these are being admitted over objection." The court read to the jury the following: "Ladies and Gentleman of the Jury, the books taken from Lucio Estrada's residence and the handguns taken from his residence and the note from a notepad taken from his residence are being admitted for a limited purpose. These items are only admissible if they are related to the motive, knowledge, planning or preparation of the crime, and enhancement alleged against Mr. Estrada and for no other purpose. [¶] If you determine that either the books or the note do not directly relate to the planning or preparation or the motive or knowledge or—motive or knowledge of the crime or special allegations against Lucio Estrada, you are to disregard those items of evidence. They get whatever weight you put on them. [¶] You may not consider the books or the note for the purpose of determining whether Lucio Estrada is a bad person or whether he possesses a bad character trait, or that he is predisposed to commit a crime of the type that's charged."

> After the jury retired to deliberate, the court made a record of an objection that Estrada's counsel made shortly before the prosecutor's closing argument. As to the guns, Estrada's counsel stated that prior to trial he "objected to the introduction of handguns that were taken from Mr. Estrada's residence that weren't introduced into evidence. I should note that the prosecutor put a picture, during his presentation, of the handguns. I didn't object to that nor did I make a motion to exclude it because it actually wasn't introduced during the prosecution's case-in-chief. [¶] However, no witness testified about how any of those handguns related to the preparation of the killing of Mark Achilli. So I think the court erred in

allowing—or in the in limine ruling that the Court ruled that the guns were admissible.  [¶]  So I think that's—I made my objections in limine and because no witness testified about the relevance of the items that I've mentioned, other than—or no witness testified about them other than that they were found in Mr. Estrada's apartment, they shouldn't have been admitted, nor should they have been exhibited on in closing argument and that's—I think the record should be clear."   The court did not disagree with counsel's recollection.  Given the foregoing, we cannot agree with the People that Estrada has forfeited this issue on appeal.

"'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)  Generally, "[w]hen the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons.  [Citations.]"  (*People v. Barnwell* (2007) 41 Cal. 4th 1038, 1056 [trial court erred in admitting evidence of defendant's prior possession of handgun similar to murder weapon where prosecutor did not claim such weapon was actually used in murders]; see also *People v. Riser* (1956) 47 Cal. 2d 566, 577 [trial court erred in admitting evidence of a Colt .38-caliber revolver found in defendant's possession two weeks after murders where evidence showed weapon actually used was a Smith and Wesson .38-caliber revolver], overruled on other grounds in *People v. Morse* (1964) 60 Cal. 2d 631, 648-649; *People v. Archer* (2000) 82 Cal. App. 4th 1380, 1392-1393 [trial court erred in admitting evidence of knives recovered from defendant's residence two years after murder where knives were not murder weapon and were irrelevant to show planning or availability of weapons].)  In other words, "[e]vidence of possession of a weapon not used in the crime charged against a defendant leads logically only to an inference that defendant is the kind of person who surrounds himself with deadly weapons—a fact of *no relevant* consequence to determination of the guilt or innocence of the defendant. [Citations.]"  (*People v. Henderson* (1976) 58 Cal. App. 3d 349, 360.)

On the other hand, evidence of weapons not actually used in the commission of a crime may be admissible when they are relevant for other purposes.  (*People v. Cox* (2003) 30 Cal. 4th 916, 956 [when weapons are otherwise relevant to the crime's commission, but are not the actual murder weapon, they may still be admissible], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal. 4th 390, 421, fn. 22.)   The critical inquiry is whether the weapons evidence bears some relevance to the weapons shown to have been involved in the charged crimes, or is being admitted simply as character evidence.  (*People v. Barnwell*, *supra*, 41 Cal. 4th at pp. 1056-1057; *People v. Prince* (2007) 40 Cal. 4th 1179, 1248-1249.)

The People argue that the evidence was admissible to support the prosecution's theory that Estrada was a hired hit man and the enhancement allegation that the murder was for financial gain.  The existence of multiple firearms and ammunition supports the

prosecution's theory of liability and motive for Estrada's involvement in the killing of someone unknown to him; thus, the People assert that the firearms were not introduced to show that Estrada was a violent person but to establish the nature of Estrada's employment in this case.

While it is arguable that the People are correct, the problem is that with respect to the guns the jury was *not* told that they could *not* consider the guns for the purpose of determining whether Estrada was a bad person or whether he possessed a bad character trait, such as a hit man would have, or that he was predisposed to commit a crime of the type charged. The court gave this admonishment only with respect to the books and note.

Regardless, any error in admitting the evidence was harmless. (*People v. Watson* (1956) 46 Cal. 2d 818, 836; see *People v. Scott* (2011) 52 Cal. 4th 452, 492 [employing *Watson* analysis where evidence erroneously admitted under § 1101].)

As noted, *ante*, given the telephone records, the three eyewitness identifications that placed Estrada at the scene well before Achilli arrived, and the manner of the killing and location of the crime (miles from where Estrada lived), the items belonging to Estrada found near the crime scene, Estrada's fingerprints on the directions to Achilli's residence, gunshot residue on Estrada's gloves recovered from near the crime scene and the cash found in the black bag recovered from Estrada's residence, we conclude that any assumed error in admitting evidence concerning the guns found in Estrada's residence was harmless. That is, after an examination of the entire cause, including the evidence, this court is of the opinion that it is not reasonably probable that a result more favorable to Estrada would have been reached in the absence of the alleged error.

Estrada's attempt to elevate the asserted error to a violation of due process is unavailing. The "routine application of state evidentiary law does not implicate [a] defendant's constitutional rights." (*People v. Brown* (2003) 31 Cal. 4th 518, 545.) "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*. [Citations.]" (*People v. Partida* (2005) 37 Cal. 4th 428, 439.)

In determining whether an evidentiary ruling denied Estrada due process of law, we note that "the presence or absence of a state law violation is largely beside the point" because "failure to comply with the state's rules of evidence is neither a necessary nor a sufficient basis" for granting relief on federal due process grounds. (*Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 919-920.) If Estrada "demonstrates the admission of evidence violated federal due process rights, he need not demonstrate the *Watson* standard for prejudicial error. Under *Chapman v. California* (1967) 386 U.S. 18, 24 . . . , in the case of a deprivation of federal due process, reversal is required unless the state can prove beyond a reasonable doubt that the error did not contribute to the verdict. [Citations.]" (*People v. Albarran* (2007) 149 Cal. App. 4th 214, 229.)

"Only if there are *no permissible* inferences the jury may draw from

the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' [Citation.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." (*Jammal v. Van de Kamp*, *supra*, 926 F.2d at p. 920.) "The dispositive issue is . . . whether the trial court committed an error which rendered the trial 'so "arbitrary and fundamentally unfair" that it violated federal due process.' [Citations.]" (*Reiger v. Christensen* (9th Cir. 1986) 789 F.2d 1425, 1430.)

Looking at the effect of the gun evidence on the trial as a whole, we believe that the evidence was not of such quality as necessarily prevented a fair trial. For the same reasons as noted in our *Watson* analysis, we conclude beyond a reasonable doubt that the error in admitting the gun evidence did not contribute to the verdict. Due process violations are assessed under the harmless beyond a reasonable doubt standard of *Chapman v. California*, *supra*, 386 U.S. at page 24. (*People v. Mena* (2012) 54 Cal. 4th 146, 159.)

See *Garcia*, 2015 WL 917801, *12-15 (footnote omitted).

### b. Admission of Evidence of Three Books (Claim Three)

Petitioner claims a violation of his federal constitutional rights based on the admission of evidence that three books allegedly showing he was hit man were found in the search of his residence. Dkt. 1-1 at 28-31; Dkt. 1-2 at 60-80. The state appellate court described the factual background on this claim and rejected it as follows:

When Officer Whitfield searched Estrada's residence he found three books. One was entitled "Surgical Speed Shooting," another "The Gun Digest, Book of Handgunnery," and a third, "Hit Man." As explained, *ante* in section II, Estrada's counsel objected to this evidence and asked the court to read the stipulation concerning the evidence. Specifically, as to the books, the court told the jury they were "being admitted for a limited purpose. These items are only admissible if they are related to the motive, knowledge, planning, or preparation of the crime, and enhancement alleged against Mr. Estrada and for no other purpose."

Estrada argues that he had a First Amendment right to possess these books and it was therefore improper to introduce them to prove the section 1101, subdivision (b) factors of motive, knowledge, planning, or preparation. We are not persuaded.

All relevant evidence is admissible. (§ 351.) Relevant evidence is defined as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.) The trial court has "'wide discretion'" in deciding the relevance of evidence. (*People v. Kelly* (1992) 1 Cal. 4th 495, 523; § 352.) This court will not disturb a trial court's exercise of discretion in admitting evidence "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest

United States District Court
Northern District of California

miscarriage of justice . . . .'" (*People v. Rodriguez* (1999) 20 Cal. 4th 1, 9-10.)  To put it another way, a trial court's exercise of discretion will not be disturbed on appeal unless it appears that "'the resulting injury is sufficiently grave to manifest a miscarriage of justice. [Citation.]  In other words, discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered.'" (*People v. Green* (1995) 34 Cal. App. 4th 165, 182-183.)

Here the trial court allowed Officer Whitfield to testify that three books were found in Estrada's residence and that they were entitled *Surgical Speed Shooting*, *The Gun Digest Book of Handgunnery*, and *Hit Man*.  Estrada was a hired hit man—hired by Garcia to kill Achilli as contrasted with Garcia's theory that Estrada was a drug dealer and the murder resulted from a drug deal that went wrong. The trial court limited the use of the evidence about the books to establish only Estrada's planning and preparation for the crime.  The jury was specifically told that they could not use the evidence to establish that Estrada was a bad person or predisposed to commit a crime.  The trial court's finding that the evidence was relevant was not an abuse of discretion.

As to Estrada's argument that he had a First Amendment right to possess these books and therefore it was error to admit the books into evidence because their possession was constitutionally protected, we perceive no violation of Estrada's First Amendment rights.  Estrada was not charged with any crimes arising out of the possession of the books.  Furthermore, the United States Supreme Court has held that "the Constitution does not erect a *per se* barrier to the admission of evidence" protected by "The First Amendment." (*Dawson v. Delaware* (1992) 503 U.S. 159, 165.)[FN 18]  As long as the evidence is relevant to some issue being tried, then it is admissible.  (*Id.* at p. 164.)  Here the evidence was relevant to Estrada's planning and preparation for the murder, as well as the allegation that the murder was committed for financial gain; the special allegation that Estrada committed the murder for financial gain makes relevant books that provide instruction on murder for hire.  His notes that reflected techniques and advice from the books were relevant to establish planning and preparation.

[FN 18:] In *Dawson v. Delaware*, *supra*, 503 U.S. 150, a capital case, the United States Supreme Court held that the introduction of evidence at the penalty phase of the trial of the defendant's membership in a White racist prison gang, the Aryan Brotherhood, violated the defendant's First Amendment rights.  (*Id.* at p. 165.) However, the evidence had no relevance because the victim and the defendant were both white and there was no possible racial motivation for the killing. (*Id.* at p. 166.)  Nor did the evidence have any other relevance; it simply presented the defendant's "abstract beliefs" and there was no attempt to link those beliefs to any factor relevant to the sentencing, or to the defendant's future dangerousness. (*Ibid.*)

Alternatively, Estrada argues that it was error to admit the books because their possession did not constitute misconduct within the meaning of section 1101, subdivision (b).  In essence, Estrada's

29

argument is that because section 1101, subdivision (b) refers to a crime, civil wrong or other act and the other act must be read in context to mean misconduct and his possession of the books was perfectly legal, the trial court erred in admitting the books under Evidence Code section 1101, subdivision (b).

Section 1101 provides "(a) Except as provided in this . . . evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . .)"

The problem with Estrada's argument is that it is based on his assertion that "other act" in section 1101, subdivision (b) must be a bad act. He invokes the doctrine of noscitur a sociis, " ' it is known by its associates,' " which is the principle that " ' " 'the meaning of a word may be enlarged or restrained by reference to the object of the whole clause in which it is used.' " ' " (*Texas Commerce Bank v. Garamendi* (1992) 11 Cal. App. 4th 460, 471, fn. 3.)

Estrada fails to mention that the principle of construction he invokes is applied as a secondary principle of statutory construction. (*Texas Commerce Bank v. Garamendi*, *supra*, 11 Cal. App. 4th at p. 471.) The doctrine is merely an extrinsic aid to interpretation and is "to be used only when the clear meaning of the words used in the statute is doubtful . . . ." (*People v. Fields* (1980) 105 Cal. App. 3d 341, 344; 2A Sutherland, Statutory Construction (7th ed. 2014) § 47.16, p. 353.) It "may not be used to create doubts or offset the plain meaning of the statutes [citation]." (*People v. Fields*, *supra*, at p. 344.) We must first consider "the primary rule of statutory construction that courts must attempt to ascertain the legislative purpose by reading the statute as a whole and in connection with related statutes." (*Texas Commerce Bank v. Garamendi*, *supra*, at p. 470.) "We begin by considering the statute's words because they are generally the most reliable indicator of legislative intent." (*People v. Trevino* (2001) 26 Cal. 4th 237, 241.)

The word "act" has a plain meaning. If the Legislature had intended to restrict the word "act" in section 1101, subdivision (b) to "bad" acts, it would have done so. It did not. Section 1101, subdivision (a) "makes no distinction between criminal and noncriminal conduct." (*People v. St. Andrew* (1980) 101 Cal. App. 3d 450, 462.)

In *People v. Enos* (1973) 34 Cal. App. 3d 25 (*Enos*), in a prosecution for burglarizing a private garage, the prosecution introduced evidence of two prior incidents involving garage burglaries. One of these had resulted in the defendant's conviction of receiving stolen goods and thus constituted a prior offense, but the other established no crime on his part and therefore amounted to merely a prior "act." (*Id.* at pp. 29-33, 42) In *Enos*, the defendant's prior "act" came in through the testimony of a witness, a Mrs. Scott, who stated that she had observed a man in her front yard looking

30

into a bedroom window. As she stopped her car the man approached her and asked if a Mr. Garcia lived there; when she responded in the negative, the man asked her if Mr. Garcia lived in the area and when she responded she did not know, the man got in a Volkswagen and drove away. The witness was then asked by the prosecutor if the man she saw was in court. The witness responded, "'I believe it is the defendant.'" (*Id.* at p. 33.) The *Enos* court framed the issue on appeal as "the relevancy of the subject evidence" and cited the applicable rule as that stated in section 1101, subdivisions (a) and (b). (*Enos, supra,* at p. 33.) The *Enos* court stated, "In the application of this rule in a criminal case the general test of admissibility is whether the evidence tends logically, naturally and by reasonable inference, to establish any fact material for the People, or to overcome any material matter sought to be proved by the defense. [Citations.] 'If it does, then it is admissible, *whether it embraces the commission of another crime or does not,* whether the other crime be similar in kind or not, whether it be part of a single design or not.' [Citations.]" (*Id.* at p. 34, italics added.) As to the incident that was a prior act and not a crime, nor even a prior bad act, the *Enos* court stated, "We have no difficulty concluding that evidence of the incident occurring at Mrs. Scott's residence on September 15, 1971, was relevant to the issues . . . . (*Id.* at p. 36.)

In a related argument, the defendant in *Enos* challenged an instruction requested by the prosecution, which told the jury that "'Evidence has been received tending to show that the defendant committed [a crime] [crimes] other than that for which he is on trial . . . .'" (*Enos, supra,* 34 Cal. App. 3d at p. 42.) He asserted that the court failed to inform the jury that he had not been arrested for or convicted of the November 10, 1970, burglaries and that no crime had been shown by the testimony of Mrs. Scott. (*Ibid.*)

The *Enos* court stated, "The subject instruction was clearly a correct statement of the law insofar as the . . . incident [that resulted in a conviction was] concerned since defendant was found guilty of receiving stolen property . . . . Accordingly, as limited to this offense the instruction was couched in proper language. Concerning the [Mrs. Scott] incident, there was no evidence that this constituted a crime nor did the prosecution make any claim or statement that it did. This incident constituted an 'act' rather than a crime, and as we have pointed out above, evidence of this act was admissible under Evidence Code section 1101. The trial court should have included the word 'act' in its instruction." (*Enos, supra,* 34 Cal. App. 3d at p. 42.)

In sum, we reject Estrada's argument that the word "act" in section 1101, subdivision (b) refers to a bad act or misconduct.

Estrada raises numerous other arguments as to why the evidence concerning the books was inadmissible. As to his argument that the books were inadmissible because no witness testified as to how they were relevant, it was not necessary for a witness to testify as to their relevance. The court instructed the jury as to how they could use the evidence. The court had already determined that the book evidence was admissible and relevant. Relevancy is concerned with the

probate quality of the evidence offered and it is the duty of the trial judge to determine relevance. (Pen. Code, § 1044.) "The relevancy of proffered proof in a criminal case depends upon whether or not it tends to sustain a legitimate hypothesis of the guilt of the defendant and, generally speaking, an incidental fact is relative to the main fact in issue when, in accord with the ordinary course of events and common experience the existence of the incidental fact, standing alone or when considered in connection with other established facts, tends in some degree to make the main fact in issue certain. It is not necessary that such incidental fact should bear directly upon the main fact in issue, for it will suffice as a pertinent piece of proof if it can be said to constitute a link, however small, in the chain of evidence, and tends thereby to establish the existence of the main fact in issue. [Citation.]" (*People v. Billings* (1917) 34 Cal. App. 549, 552-553.) The strength of such tendency, or the amount of such weight, is to be determined by the jury. (*Moody v. Peirano* (1906) 4 Cal. App. 411, 418.)

The special circumstance allegation that Estrada committed the murder for financial gain makes relevant the books he possessed that provided instruction on murder for hire. His notes reflecting techniques and themes from the books were relevant to establish planning for the murder.

As to Estrada's argument that the books constituted bad character or propensity evidence, we note that the court instructed the jury that they could not consider the books as evidence that Estrada was a bad person or as to whether he possessed a bad character trait, or that he was predisposed to commit a murder. "Absent any contrary indication, we presume the jury followed this instruction." (*People v. Gray* (2005) 37 Cal. 4th 168, 217.)

As to Estrada's argument that the books were more prejudicial than probative, we note that " '[a]ll evidence [that] tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence [that] uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" (*People v. Karis* (1988) 46 Cal. 3d 612, 638.)

Estrada argues that with regard to the book *Hit Man* the prosecutor urged the jury to read the entire book and that was the greatest source of prejudice here. Estrada misreads the record; the prosecutor described for the jury portions of the book that he deemed were relevant, and told the jury, "you can look at the whole book. It's fine to read, I wouldn't absorb the lessons of it, however." This falls far short of urging the jury to read the entire book. Even if one or more jurors had read the entire book, any material in the book that had no probative value on the issues for which it was admitted would have been disregarded by the jury because they were instructed that if the books did not directly relate to the planning or preparation or the motive or knowledge of the crime or special allegations against Estrada, they were to disregard those items of evidence. Again, we must presume the jury followed

this instruction.  (*People v. Gray, supra*, 37 Cal. 4th at p. 217.)

As to Estrada's argument that there was insufficient foundation that he personally read the books at the pertinent time, this does not preclude them from being admitted into evidence.  This argument goes to the weight of the evidence rather than its admissibility; the jury could have considered the prosecution's failure to establish that Estrada read the books and given little weight to them.  Of course, the parallels between Estrada's notes and the techniques and themes outlined in the books suggest that Estrada used them as reference.

As to Estrada's argument that the limiting instruction was inadequate to ensure that the jury used the books only for the designated limited purposes, we reiterate that we presume the jury followed the court's instructions.  (See *People v. Richardson* (2008) 43 Cal. 4th 959, 1004; *People v. Davis* (2005) 36 Cal. 4th 510, 537.)  Recently, our Supreme Court reaffirmed this rule: "We reject as entirely speculative defendant's assertion that these limiting instructions were inadequate.  'Any prejudice that the challenged information may have threatened must be deemed to have been prevented by the court's limiting instruction to the jury.  We presume that jurors comprehend and accept the court's directions.  [Citation.]  We can, of course, do nothing else.  The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions.'  [Citation.]"  (*People v. Homick* (2012) 55 Cal. 4th 816, 866 867.)  These repeated and plain holdings of our Supreme Court thus undermine Estrada's argument that "lay jurors could not ignore the powerful effect of those three books in evaluating [his] character."

Finally, as to Estrada's argument that the trial court failed to thoroughly read the challenged literature and therefore could not make a reasonable determination regarding their probative value rather than prejudicial effect, absent some evidence to the contrary, we must presume that the trial court adequately reviewed the evidence.  (§ 664 [it is presumed that official duty has been regularly performed].)  The record does not establish that the trial court failed to adequately review the evidence.

In sum, the trial court did not err in admitting into evidence books found in Estrada's home.

*See Garcia*, 2015 WL 917801, *15-19.

### c.      Admission of Handwritten Notes (Claim Four)

Petitioner contends that the admission into evidence of handwritten notes with incriminating statements found in his residence violated his federal constitutional rights.  Dkt. 1-1 at 31-32; Dkt. 1-2 at 81-82.  The state appellate court described the factual background on this claim and rejected it as follows:

As noted, during the search of Estrada's apartment, officers found a purple notebook (People's exhibit No. 92) and a gray notebook

(People's exhibit No. 93). During his argument to the jury, the prosecutor referred to some of the notes that were in the purple notebook. Estrada argues that it was error to admit these handwritten notes against him. He contends that they were inadmissible for the same reasons that the books and guns were inadmissible; and they were inadmissible because absent expert testimony that the handwriting was his, there was insufficient foundation to establish that he wrote the notes.

Initially, we note that although the notebooks were admitted into evidence, the court did not allow them to go back into the jury room absent a request by the jury to view them. No request by the jury to view exhibit Nos. 92 and 93 appears in the record.[FN 19] Accordingly, we must conclude that the notebooks were never viewed by the jury.

[FN 19:] We note for the record that we had the record augmented with exhibit Nos. 91, 92, and 93. The two notebooks exhibit Nos. 92 and 93 have a few scribbled drawings and a few notes written in Spanish, but the vast majority of the pages in exhibit No. 92 are blank. The majority of pages in exhibit No. 93 appear to be notes regarding drawing or sketching figures.

As to Estrada's argument that the notebooks were inadmissible for the same reasons as the books and guns were inadmissible, we reject the argument for the same reasons noted *ante*.

As to Estrada's argument that there was no evidence to establish the authenticity of the writings, certainly a writing must be authenticated before being admitted into evidence or before secondary evidence of its contents is received. (§ 1401.) A writing is admissible if a finding of authentication is supported by a preponderance of the evidence. (*Jazayeri v. Mao* (2009) 174 Cal. App. 4th 301, 321.) The proponent of a writing satisfies the requirement of authentication when he or she introduces evidence sufficient to sustain a finding that the writing is what it is purports to be. (§ 1400.) Even if conflicting inferences can be drawn from the evidence supporting authentication, that consideration goes to the weight of the evidence and not to its admissibility. (*Jazayeri v. Mao*, *supra*, at p. 321.)

In other words, "[a]uthentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (§ 1400.)

There are a number of methods by which an article may be authenticated. (§ 1410.) We review a trial court's decision regarding the admission of evidence for abuse of discretion. (*Dart Industries, Inc. v. Commercial Union Ins. Co*. (2002) 28 Cal. 4th 1059, 1078.)

Officer Whitfield testified that he recovered a purple notebook in Estrada's living room inside a Dell computer bag. He recovered a gray notebook in the dining room cabinet. Inside one of the

notebooks was a letter addressed to Estrada from the United States Army Recruiting Command, Fort Knox, Kentucky. The police found numerous papers with Estrada's name on them inside the one-bedroom apartment. Authentication need not be established in any particular manner. "The law is clear that the various means of authentication as set forth in Evidence Code sections 1410-1421 are not exclusive. Circumstantial evidence, content and location are all valid means of authentication [citations]." (*People v. Gibson* (2001) 90 Cal. App. 4th 371, 383.)[FN 20]

[FN 20:] *In People v. Olguin* (1994) 31 Cal. App. 4th 1355, for example, several sheets of rap lyrics were authenticated as having been authored by the defendant through evidence establishing their location when found—his bedroom—and their content—referring to the defendant's gang and identifying the composer with the defendant's gang moniker. Accordingly, they were properly admitted to establish the defendant's gang membership, his loyalty to his gang, his familiarity with gang culture, and "inferentially, his motive and intent on the day of the killing." (*Id.* at p. 1373.) Similarly, in *People v. Gibson*, two manuscripts were authenticated as the defendant's writings by their content—references to the author as "'Sasha,'" one of the defendant's aliases, and descriptions of a prostitution enterprise similar to one operated by defendant as established by independent evidence—and the locations from which they were seized—the defendant's home and hotel room. The Court of Appeal held that the trial court had not erred in permitting the prosecution to use the documents to show that the defendant was acting as a madam. (*People v. Gibson*, *supra*, 90 Cal. App. 4th at p. 382.)

We have taken judicial notice of and examined the notebooks and compared what is in them to what the books contain. There are several references in the notebooks that can also be found in the books—for instance, the handwritten notes talk about surveillance, military style precision, the use of gloves and disguises, and fake wigs, all of which are themes and concepts covered in the book *Hit Man*. At least one of the notes is written in the first person—"I will continue to progress into a better person." Further, located between the pages of one of the notebooks was a letter addressed to Estrada. Thus, both the content and location of the notebooks identified them as belonging to Estrada. Moreover, no evidence showed that these items belonged to anyone else. Therefore, the notebooks were properly authenticated and properly admitted into evidence.

In any case, even if the court erred, the error was harmless. Given the overwhelming evidence that this was a murder for hire and the eyewitness testimony from which the jury could conclude that Estrada was lying in wait, any error in admitting the notebooks was harmless under any standard of prejudice.

*Garcia*, 2015 WL 917801, *19-21.

### 3. Analysis

In all three claims, Petitioner seems to argue that it was error to admit the aforementioned

35

evidence because their possession did not constitute misconduct within the meaning of California

Evidence Code § 1101(b) and that such evidence should otherwise have been excluded under

Evidence Code § 352.[8]  Specifically, Petitioner contends that the admission of the guns, the books

about guns (including the hit man manual), and the two notebooks with incriminating notes[9] was

prejudicial because they amounted to propensity evidence.  *See* Dkt. 1-1 at 26, 29, 32.

The Court finds that Petitioner's three claims relating to the improper admission of the

aforementioned evidence lack merit.  First, assuming arguendo that such evidence was improperly

admitted as character or propensity evidence bearing no relevance to any material issue, AEDPA

precludes federal habeas relief because the United States Supreme Court has expressly left open

the question of whether the admission of such evidence violates due process.  *See Estelle*, 502

U.S. at 75 n.5 ("[W]e express no opinion on whether a state law would violate the Due Process

Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged

crime.").  Based on the Supreme Court's reservation of this issue as an "open question," the Ninth

Circuit has held that a petitioner's due process right concerning the admission of propensity

evidence is not clearly established as required by AEDPA.  *Alberni v. McDaniel*, 458 F.3d 860,

866-67 (9th Cir. 2006); *accord Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008), *reaffirming

Alberni*; *see, e.g.*, *Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008) (because Supreme

Court expressly reserved the question of whether using evidence of prior crimes to show

propensity for criminal activity could ever violate due process, state court's rejection of claim did

not unreasonably apply clearly established federal law).  Because the Supreme Court has elected

---

[8] California Evidence Code § 1101(b) permits admission of evidence when it is relevant to establish some fact other than the person's character, such as motive or intent.  Under section 352, a trial court is to exclude evidence where the probative value of the evidence is substantially outweighed by the potential for prejudice.

[9] The state appellate court was objectively reasonable in determining that the notebooks were properly authenticated.  *See Garcia*, 2015 WL 917801, *20-21.  The state appellate court took judicial notice of and examined the notebooks and compared what was in them to what the books contained, noting that there were "several references in the notebooks that can also be found in the books," including "surveillance, military style precision, the use of gloves and disguises, and fake wigs."  *Id.*  Further, the state appellate court noted that located between the pages of one of the notebooks was a letter addressed to Petitioner.  *Id.*  Finally, both the content and location of the notebooks identified them as belonging to Petitioner.  *Id.*

36

to leave this an open issue, a trial court's decision to the aforementioned evidence does not violate clearly established federal law as determined by the Supreme Court. *See id.*

Second, Petitioner has not shown that the state appellate court's decision as to these three claims outlined above was objectively unreasonable. A state court's determination of state law is binding on this Court. *See Hicks v. Feiock*, 485 U.S. 624, 629 (1988). Moreover, any prejudicial effect flowing from this evidence was ameliorated by the limiting instructions read to the jury. As mentioned above, during Officer Whitfield's direct testimony defense counsel asked the court to read a stipulation regarding items found in Petitioner's residence and "note that these are being admitted over objection." 5RT 664. In response, the trial court read to the jury the following:

> Yes. Ladies and Gentleman of the Jury, the books taken from Lucio Estrada's residence and the handguns taken from his residence and the note from a notepad taken from his residence are being admitted for a limited purpose. These items are only admissible if they are related to the motive, knowledge, planning or preparation of the crime, and enhancement alleged against Mr. Estrada and for no other purpose. [¶] If you determine that either the books or the note do not directly relate to the planning or preparation or the motive or knowledge or—motive or knowledge of the crime or special allegations against Lucio Estrada, you are to disregard those items of evidence. They get whatever weight you put on them. [¶] You may not consider the books or the note for the purpose of determining whether Lucio Estrada is a bad person or whether he possesses a bad character trait, or that he is predisposed to commit a crime of the type that's charged.

5RT 664-665. The Court presumes that the jury followed its instructions and used the evidence appropriately. *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). However, the state appellate court correctly pointed out that: (1) the aforementioned instruction did *not* instruct the jury to that "they could *not* consider the guns for the purpose of determining whether [Petitioner] was a bad person or whether he possessed a bad character trait, such as a hit man would have, or that he was predisposed to commit a crime of the type charged"; and the trial court "gave this admonishment only with respect to the books and note." *Garcia*, 2015 WL 917801, *14. Ultimately, however, the state appellate court concluded that even if the evidence should have been excluded, such error was harmless in light of the overwhelming evidence of Petitioner's guilt of first degree murder with special circumstances of financial gain and lying in wait, including: telephone records; three

eyewitness identifications; DNA evidence; fingerprint evidence; and cash found in his residence.[10] In finding harmless error, the state appellate court implicitly found no due process violation. *See Bains v. Cambra*, 204 F.3d 964, 971 n.2 (9th Cir. 2000) ("[the harmless error] standard under California state law is the equivalent of the *Brecht* standard under federal law, to wit, whether the errors had a "'substantial and injurious effect or influence in determining the jury's verdict'") (citation omitted).

Accordingly, the Court finds that the state appellate court's rejection of Petitioner's claims based on the allegedly erroneous admission of the aforementioned evidence (the guns, the books, and the handwritten notes) was neither contrary to nor involved an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Therefore, Petitioner is not entitled to habeas relief on these claims, and the Court DENIES Claims Two, Three, and Four.

### C.    Confrontation Clause Violations (Claims Five-Six)

#### 1.    Applicable Federal Law

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him." U.S. Const. amend. VI. The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. *Crawford*, 541 U.S. at 61. It commands, not for evidence to be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. *Id.* The Clause thus reflects a judgment, not only about the desirability of reliable evidence, but about how reliability can best be determined. *Crawford*, 541

---

[10] The state appellate court also determined that the admission of the books did not violate Petitioner's First Amendment right to possess them under *Dawson v. Delaware*, 503 U.S. 159, 164 (1992), "[a]s long as the evidence is relevant to some issue being tried." *Garcia*, 2015 WL 917801, *16. The state appellate court determined that the books were relevant to Petitioner's "planning and preparation for the murder, as well as the allegation that the murder was committed for financial gain; the special allegation that [he] committed the murder for financial gain makes relevant books that provide instruction on murder for hire." *Id.* The state appellate court further determined "his notes that reflected techniques and advice from the books were relevant to establish planning and preparation." *Id.* The state appellate court's ruling was not an unreasonable application of clearly established Supreme Court law. In *Dawson*, the Supreme Court held that "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Dawson*, 503 U.S. at 165. Further, the First Amendment does not prohibit the introduction of relevant evidence. *Id.* at 164-68.

U.S. at 61.

The Confrontation Clause applies to all "testimonial" statements. *See Crawford*, 541 U.S. at 50-51. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51 (internal quotation, brackets, and citation omitted); *see id.* ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). The Confrontation Clause applies not only to in-court testimony but also to out-of-court statements introduced at trial, regardless of the admissibility of the statements under state laws of evidence. *Id.* at 50-51.

### 2. Oral and Written Statements by Miguel (Claim Five)

Petitioner contends that his Sixth Amendment right to confront a witness against him—or in this case, not a witness but his co-defendant, Miguel—was violated when the trial court admitted the oral and written statements by Miguel, who did not testify at trial. Dkt. 1-1 at 33-35; Dkt. 1-2 at 79; Dkt. 1-3 at 1-8.

#### a. State Court Opinion

The state appellate court gave the following background and rejected this claim, as follows:

> As noted, Sergeant Frisby described his interview with Miguel because Miguel did not testify. According to Sergeant Frisby, Miguel said his cousin Daniel told him how to find Achilli's photograph on the Internet. Then, Miguel said that he printed out the photograph and "gave this photo[graph] to someone that he knew." Miguel also told Sergeant Frisby that "he gave someone $1500 in cash."
>
> Estrada contends that he was denied his right to confront the witnesses against him by admission of Miguel's statements to the police because, in essence, Miguel's statement about giving things to "someone" inculpated him.
>
> The confrontation clause of the Sixth Amendment of the United States Constitution provides that "'[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" (*Crawford v. Washington* (2004) 541 U.S. 36, 42 (*Crawford*).) The confrontation clause has traditionally barred "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Id.* at pp. 53-54.)

As the California Supreme Court explained recently, "The *Aranda/Bruton* rule[FN 21] addresses a specific issue that arises at joint trials when the prosecution seeks to admit the out-of-court statement of a nontestifying defendant that incriminates a codefendant. As we have observed, "'*Aranda* and *Bruton* stand for the proposition that a 'nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given.' [Citation.]" [Citation.] The United States Supreme Court "limited the scope of the *Bruton* rule in *Richardson v. Marsh* (1987) 481 U.S. 200 . . . . The court explained that *Bruton* recognized a narrow exception to the general rule that juries are presumed to follow limiting instructions, and this narrow exception should not apply to confessions that are not incriminating on their face, but become so only when linked with other evidence introduced at trial. (*Richardson, supra,* at pp. 206-207.)'" [Citations.] The high court went on to hold in *Richardson* that admission of a nontestifying codefendant's confession against the defendant does not violate the defendant's confrontation right if the confession is redacted to eliminate not only the defendant's name but any reference to his existence. (*Richardson, supra,* at p. 211.) 'When, despite redaction, the statement obviously refers directly to the defendant, and involves inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial, the *Bruton* rule applies and introduction of the statement at a joint trial violates the defendant's rights under the confrontation clause.' [Citation.]" (*People v. Capistrano* (2014) 59 Cal. 4th 830, 869.)

[FN 21:] *People v. Aranda* (1965) 63 Cal. 2d 518; *Bruton v. United States* (1968) 391 U.S. 123.

The People argue that this claim has been forfeited because Estrada's counsel did not object to the introduction of the redacted statement and in fact reached an agreement with the prosecutor regarding the presentation of Miguel's statement.

No procedural principle is more familiar to the United States Supreme Court than that the failure to assert a federal constitutional right at trial can forfeit the right on appeal. (*United States v. Olano et al.* (1993) 507 U.S. 725, 731; cf. *United States v. Young* (1985) 470 U.S. 1, 15-16.) Alternatively, Estrada contends that trial counsel's failure to object to Sergeant Frisby's testimony that Miguel said he gave Achilli's photograph to "someone" he knew constituted ineffective assistance of counsel.

For reasons we will explain, we do not need to determine whether Estrada forfeited appellate review of this issue or whether the admission of Miguel's testimony through Sergeant Frisby constituted error under the confrontation clause because any such error was harmless beyond a reasonable doubt.[FN 22]

[FN 22:] The statements that Estrada challenges do not lead to the inevitable conclusion that Achilli's photograph and the money were passed directly from Miguel to Estrada. In fact, the forensic

evidence established that Cesar Chaidez's fingerprints were on the driving directions, which leads to the conclusion that Cesar Chaidez may have been a middle man between Miguel and Estrada.

Confrontation clause violations are subject to harmless error analysis under *Chapman v. California, supra*, 386 U.S. at page 24. (*People v. Lewis* (2008) 43 Cal. 4th 415, 461, overruled on other grounds in *People v. Black* (2014) 58 Cal. 4th 912, 919.) This standard provides "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt. [Citations.]" (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681.) "These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. [Citations.]" (*Id.* at p. 684.)

In other words, improper introduction of a codefendant's out-of-court statement requires reversal only if the error was not harmless beyond a reasonable doubt. (*People v. Archer* (2000) 82 Cal. App. 4th 1380, 1390.) "That analysis generally depends on whether the properly admitted evidence is so overwhelming as to the guilt of the nondeclarant that a reviewing court can say the constitutional error is harmless beyond a reasonable doubt." (*Ibid.*)

Estrada's involvement in this crime was established by eyewitness testimony that showed that Estrada was present at the scene well before Achilli's murder; telephone records that established that Estrada and Miguel were in almost constant communication on the day of the murder and evidence left at the scene of the crime. Estrada's fingerprints were found on the directions to Achilli's residence and his DNA was found on the gloves, jacket, and baseball cap recovered from the scene. There was gunshot residue on the gloves. The telephone records showed that Estrada and Miguel telephoned each other repeatedly on the morning of the murder and at least one of the calls was picked up by the Los Gatos cellular tower. The police recovered a black bag containing $2,000 cash from Estrada's apartment as well as a baseball cap similar to the one recovered from the scene of the crime. Further, Daniel's testimony established that he asked Miguel if he knew someone who could take care of a problem; and they agreed on a price of $9,500. This overwhelming evidence establishes that this was a murder for hire situation and that Estrada premeditated the murder—any error in the admission of Miguel's statements that he gave "someone" Achilli's photograph and $1,500 in cash were harmless beyond a reasonable doubt. (*People v. Jefferson* (2008) 158 Cal. App. 4th 830, 845.)

*See Garcia*, 2015 WL 917801, *21-22.

### b.     Analysis

The use of the out-of-court confession (or inculpatory statements) of a co-defendant who

did not testify at trial violates the non-confessing defendant's right of cross-examination secured by the Confrontation Clause. *Bruton v. United States*, 391 U.S. 123, 134-37 (1968). Such a violation is not cured by a jury instruction that the confession should be disregarded in determining the non-confessing defendant's guilt or innocence. *Id.* *Bruton* error, however, does not require reversal "'if the other evidence of guilt was overwhelming and the prejudice to the defendant from his co-defendant's admission slight by comparison.'" *Id.* (quoting *United States v. Guerrero*, 756 F.2d 1342, 1348 (9th Cir.)); *see United States v. Gillam*, 167 F.3d 1273, 1277 (9th Cir. 1998) (finding *Bruton* error where co-defendant's redacted admission clearly implicated defendant, but finding error harmless because of strength of government's case against defendant).

As explained above, the state appellate court denied Petitioner's claims on the ground that admission of Miguel's oral and written statements was harmless beyond a reasonable doubt. *See Garcia*, 2015 WL 917801, *22.

In the present case, the prosecutor and Petitioner's attorney reached an agreement to redact all references to Petitioner in the presentation of Miguel's statements. 1RT 103-105. As the California Court of Appeal explained in its summary of the facts, Miguel's recorded confession was not played for the jury but came into evidence through the testimony of Sergeant Frisby and through a redacted copy of his written confession, which contained no reference to Petitioner. *Garcia*, 2015 WL 917801, *8, n.11. Sergeant Frisby testified that Miguel told him that on March 13, 2008, he gave someone Achilli's photograph and address and $1,500 in cash. 14RT 2660-2661. Petitioner's counsel did not object to the introduction of Miguel's statement.

The state appellate court acknowledged the government's contention that Petitioner forfeited his claim of confrontation error but concluded that "[f]or reasons we will explain, we do not need to determine whether Petitioner forfeited appellate review of this issue or whether the admission of Miguel's testimony through Sergeant Frisby constituted error under the confrontation clause because any such error was harmless beyond a reasonable doubt." *See Garcia*, 2015 WL 917801, *22. Specifically, the state appellate court reasonably determined that if confrontation error occurred, it was harmless beyond a reasonable doubt and that any error in the admission of Miguel's statements did not have a substantial and injurious effect on the jury's verdict against

42

Petitioner. *See id.* Such a ruling was not "contrary to" clearly established federal law. *See* 28 U.S.C. § 2254(d)(1)(a).

In *Davis v. Ayala*, the Supreme Court held that a state court's determination that a constitutional error was harmless under *Chapman*, 386 U.S. 18, constitutes an adjudication on the merits that is subject to AEDPA deference. 135 S. Ct. 2187, 2198-99 (2015). Thus, habeas relief is unavailable unless the state court applied *Chapman* in an objectively unreasonable manner. *Id.* at 2198. In addition, "a prisoner who seeks federal habeas corpus relief must satisfy *Brecht*," which requires a showing that the error had a substantial and injurious effect on the verdict. *Id.* at 2199. Formal application of both tests is not necessary where the error is plainly harmless under the more stringent *Brecht* test, which subsumes the more liberal unreasonable-application-of-*Chapman* test. *Id.* at 2198-99; *Fry v. Pliler*, 551 U.S. at 119-20.

Here, any error was plainly harmless under either standard. Miguel's statement that he gave the picture, address, and money to someone was not a part of the prosecution's case against Petitioner. The prosecutor did not mention Miguel's statement when he summarized the evidence against Petitioner. *See* 21RT 4333-4345, 22RT 4585-4591. In addition, as the state court noted, it was possible that Miguel handed the items to Cesar, who gave them to Petitioner, since Cesar's fingerprints were on the driving directions that Petitioner discarded. 5RT 745-746; *Garcia*, 2015 WL 917801, *22, n.22. Moreover, Petitioner was linked to Miguel by the cell phone records and evidence that Petitioner discarded the same picture of Achilli that Garcia, Daniel, and Miguel had accessed on their computers. Finally, the telephone records, three eyewitness identifications, DNA evidence, fingerprint evidence, and cash found in his residence provided overwhelming evidence of Petitioner's guilt of first degree murder with special circumstances. Therefore, the state appellate court's determination that any error was harmless beyond a reasonable doubt was not objectively unreasonable.

On this record, this Court finds that any error in admitting the oral and written statements by Miguel was harmless because it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht*, 507 U.S. at 638. Accordingly, Petitioner is not entitled to habeas relief on this claim, and Claim Five is DENIED.

### 3.    Dr. O'Hara's Testimony about Autopsy on Achilli (Claim Six)

Petitioner argues that he was denied the right to confront a witness against him—Dr. O'Hara, the forensic pathologist who testified at trial—because Dr. O'Hara neither performed the autopsy on Achilli nor drafted the autopsy report.[11]  *See* Dkt. 1-3 at 9-13.  Petitioner claims he was denied the right to confront a witness against him because Dr. Happy, who conducted the autopsy on Achilli's body, was unavailable to cross-examine.  *See id.*

#### a.    State Court Opinion

The state appellate court rejected this claim, as follows:

> *Crawford, supra,* 541 U.S. 36, did not specify what constitutes a testimonial statement for purposes of the confrontation clause, but offered examples of the "[v]arious formulations of this core class of 'testimonial' statements," i.e., "'*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' [citation]; 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; [and] 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' [citation]." (*Id.* at pp. 51-52.)
>
> Subsequently, the high court explained that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.   They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington* (2006) 547 U.S. 813, 822 (*Davis*).)
>
> Three years later, the United States Supreme Court issued its 5-4 decision in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*), where the trial court had "admitted into evidence affidavits reporting the results of forensic analysis[,] which showed that material seized by the police and connected to the defendant was cocaine.  The question presented [was] whether those affidavits [were] 'testimonial,' rendering the affiants 'witnesses' subject to the defendant's right of confrontation under the Sixth Amendment." (*Melendez-Diaz, supra*, 557 U.S. at p. 307.)  The court determined

---

[11] On direct review, Miguel joined in Petitioner's argument and added his own substantive argument.  *See Garcia*, 2015 WL 917801, *23, n.27.  Miguel raised the same claim in his federal habeas petition, and, as mentioned above, Judge Orrick denied all of Miguel's claims, including this confrontation clause claim.  *See* Dkt. 22 at 9-12 in Case No. C 15-03367 WHO (PR).

that, since "[t]he 'certificates' are functionally identical to live, in-court testimony" (*id*. at pp. 310-311) and were made to provide prima facie evidence of the composition, quality, and weight of the analyzed substance, under *Crawford* they were "testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment." (*Id*. at p. 311.)  The "testimonial" documents were therefore not admissible, because the analysts were not subject to cross-examination and the petitioner had no prior opportunity to cross-examine.  (*Ibid*.)

In *Bullcoming v. New Mexico* (2011) 564 U.S. —, — [131 S. Ct. 2705, 2709] (*Bullcoming*), the defendant's blood sample was sent to a state lab for testing after he was arrested for drunk driving.  The analyst recorded the results on a state form and signed the form, which included a "'certificate of analyst.'"  (*Id*. at pp. — [131 S. Ct. at pp. 2709, 2710].)  A reviewer certified that the analyst was qualified and that established procedures had been followed.  (*Id*. at p. — [131 S. Ct. at p. 2711].)  At Bullcoming's trial, the analyst who tested his blood sample did not testify because he had been placed on disciplinary leave.  (*Id*. at pp. — [131 S. Ct. at pp. 2711-2712].)  The prosecution called another analyst who was familiar with the lab's testing procedures but had not signed the certification, nor had he participated in, observed, or reviewed the analysis of Bullcoming's sample.  (*Id*. at pp. — [131 S. Ct. at pp. 2710, 2712, 2713].)

The plurality opinion in *Bullcoming* explained that the surrogate analyst was an inadequate substitute for the analyst who performed the test.  Surrogate testimony by someone who is qualified as an expert regarding the machine used and the lab's procedures could not convey what the actual analyst knew or observed and would not expose "any lapses or lies" by the certifying analyst.  (*Bullcoming, supra*, 564 U.S. at p. — [131 S. Ct. at p. 2715].)  The court stated that, if the Sixth Amendment is violated, "no substitute procedure can cure the violation."  (*Bullcoming, supra*, at p. — [131 S. Ct. at p. 2716].)

*Bullcoming* reiterated the principle stated in *Melendez-Diaz* that a document created solely for an evidentiary purpose in aid of a police investigation is testimonial.  (*Bullcoming, supra*, 564 U.S. at p. — [131 S. Ct. at p. 2717].)  Furthermore, even though the analyst's certificate was not signed under oath, as occurred in *Melendez-Diaz*, the two documents were similar in all material respects.  (*Ibid*.)

Thereafter, in *Michigan v. Bryant* (2011) 562 U.S. 344 [131 S. Ct. 1143] (*Bryant*), the United States Supreme Court considered whether admission of a mortally wounded victim's statements to police officers violated the confrontation clause.  (*Id*. at p. — [131 S. Ct. p. 1150].)  Police officers asked the victim what had happened and who had shot him.  The victim identified the defendant and said the shooting had occurred about 25 minutes earlier.  (*Ibid*.)  The high court held that the primary purpose of the interrogation was to enable law enforcement to meet an ongoing emergency.  (*Id*. at p. — [131 S. Ct. at pp. 1150, 1164].)  In its description of "'ongoing emergency,'" the high court identified several factors that informed the determination of the primary purpose of the questioning, such as

45

the formality of the encounter, and the statements and actions of both the declarant and the interrogator. (*Id*. at pp. — [131 S. Ct. at pp. 1160-1161].) Quoting from *Davis, supra,* 547 U.S. at page 822, the United States Supreme Court noted, "[W]e cannot say that a person in [the victim's] situation would have had a 'primary purpose' 'to establish or prove past events potentially relevant to later criminal prosecution.'" (*Bryant, supra,* at p. — [131 S. Ct. at p. 1165].) Under all of the circumstances of the encounter, the court concluded the victim's identification of the defendant was not testimonial hearsay. (*Id.* at pp. — [131 S. Ct. at pp. 1166-1167].)

In *Williams v. Illinois* (2012) 562 U.S. — [132 S. Ct. 2221] (*Williams*), the statements at issue were those of a prosecution expert who testified that a DNA profile produced by an outside laboratory, Cellmark, matched a profile produced by the state police laboratory using a sample of the petitioner's blood. (*Id*. at p. — [132 S. Ct. at p. 2227].) A plurality of four justices held in part, "Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause." (*Id*. at p. — [132 S. Ct. at p. 2228].) The plurality offered a second basis for its decision, stating that, even if the report in question had been admitted into evidence, it was not testimonial in that it was not sought for the purpose of obtaining evidence to be used against the petitioner, who was not a suspect at the time. (*Id*. at pp. — [132 S. Ct. at pp. 2228, 2243].) The plurality observed that "[t]he abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions." (*Id*. at p. — [132 S. Ct. at p. 2242].)

Justice Thomas joined the four justices of the plurality solely in the judgment. Justice Thomas concluded that the disclosure of Cellmark's out-of-court statements by means of the expert's testimony did not violate the Confrontation Clause for the sole reason that the expert's testimony "lacked the requisite 'formality and solemnity' to be considered '"testimonial"' for purposes of the Confrontation Clause." (*Williams, supra,* 562 U.S. at p. — [132 S. Ct. at p. 2255] (conc. opn. of Thomas, J.).)

The remaining four justices joined in a vehement dissent authored by Justice Kagan in which the conclusion that the expert's testimony was not offered for its truth was found to have no merit and was labeled a "prosecutorial dodge." (*Williams, supra*, 562 U.S. at p. — [132 S. Ct. at pp. 2265, 2268] (dis. opn. of Kagan, J.).) Since Justice Thomas also believed that "statements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose" (*id*. at p. — [132 S. Ct. at p. 2257] (conc. opn. of Thomas, J.)), the dissent asserted that "Five justices specifically reject every aspect of [the plurality's] reasoning and every paragraph of its explication." (*Id*. at p. — [132 S. Ct. at p. 2265] (dis. opn. of Kagan, J.).)

Nevertheless, in *People v. Dungo* (2012) 55 Cal. 4th 608 (*Dungo*), the California Supreme Court held that statements in an autopsy report describing a nontestifying pathologist's observations of the condition of the victim's body are not testimonial because the primary purpose of recording such facts does not pertain to a criminal investigation. (*Id.* at pp. 619, 622.) Accordingly, the *Dungo* court concluded that testimony by a pathologist based on the report (including photographs) prepared by the nontestifying pathologist did not violate the defendant's confrontation clause rights even though he was unable to confront and cross-examine the nontestifying pathologist. (*Id.* at p. 621.)

In *People v. Edwards* (2013) 57 Cal. 4th 658 (*Edwards*), the California Supreme Court reiterated that "[a]utopsy statements that simply record anatomical and physiological observations" are distinct from "statements of the autopsy physician's expert forensic conclusion as to the cause of death. [Citation.]" (*Id.* at p. 706.) Without deciding whether statements in the latter category are testimonial, *Edwards* held it was permissible for an expert witness to recount the autopsy doctor's findings that the victim's nose was fractured, the injury to her ear was "'incisional,'" she had residue from adhesive tape around her mouth, and her vagina had signs of trauma. (*Id.* at pp. 707-708.) Distinguishing those findings from forensic opinions about the cause of death, the court determined it was permissible for the expert to rely on them because they merely reflected the autopsy doctor's "medical observations of objective fact." (*Id.* at p. 708.)

The problem in this case is that although Dr. O'Hara testified to autopsy statements that simply recorded anatomical and physiological observations, when asked what was the cause of Achilli's death, Dr. O'Hara recounted that "Dr. Happy phrased it as gunshot wounds of the head and torso." In other words, Dr. O'Hara was testifying to a statement regarding the autopsy physician's expert conclusion as to the cause of death. Nevertheless, we need not decide whether Dr. Happy's cause of death conclusion was testimonial in nature because even if we assume error in the admission of Dr. O'Hara's statement as to Dr. Happy's conclusion as to the cause of death, any error was harmless beyond a reasonable doubt. There was no dispute as to Dr. Happy's cause of death opinion.

*See Garcia*, 2015 WL 917801, *23-25.

### b. Analysis

After carefully reviewing the record, the Court concludes that the state appellate court's aforementioned rejection of Claim Six was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. As Respondent correctly points out, the Supreme Court has not addressed whether an autopsy report or any of its contents is "testimonial" for purposes of the Confrontation Clause. *See* Dkt. 10-1 at 39-40. Reflecting the lack of guidance

from the Supreme Court, federal courts have disagreed as to whether, post *Melendez-Diaz*, autopsy reports are entitled to the protection of the Confrontation Clause. *See Hensley v. Roden*, 755 F.3d 724, 733-34 (1st Cir. 2014) ("When other courts, post *Melendez-Diaz*, have been confronted with the question of whether autopsy reports are testimonial or not, disparity of treatment has reigned"); *United States v. James*, 712 F.3d 79, 95 (2d Cir. 2013) (*Williams* does not "yield a single, useful holding relevant" to whether autopsy reports are testimonial); *see also Flournoy v. Small*, 681 F.3d 1000, 1005 (9th Cir. 2012) ("Even today there does not appear to be clearly established federal law that would make the admission of [a crime lab employee's] testimony unreasonable under the standard set under AEDPA."). Without the existence of clearly established federal law as determined by the Supreme Court, the state appellate court's denial of this claim cannot be said to be contrary to, or an unreasonable application of, such law. *See Carey v. Musladin*, 549 U.S. 70, 76 (2006) (noting that lower courts' wide divergence in treatment of claim reflected "lack of guidance" from Supreme Court, and thus "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law'") (alterations in original) (quoting 28 U.S.C. § 2254(d)(1)); *see also Kessee v. Mendoza-Powers*, 574 F.3d 675, 677 (9th Cir. 2009) (holding that state court determination consistent with some federal courts' interpretation of Supreme Court precedent unlikely to be contrary to or involve an unreasonable application of clearly established federal law even if inconsistent with Ninth Circuit view).

Nor was the state appellate court's denial of this claim based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. In the present case, Dr. O'Hara testified that an autopsy was performed on Achilli on March 17, 2008, and that he had reviewed the autopsy report and photos. 14RT 2717. He testified that marijuana, but no alcohol or other drugs, was present in Achilli's system at the time of death. 14RT 2717. The autopsy was performed by Dr. Happy, who did not testify. 14RT 2720. Dr. O'Hara described ten autopsy photos, which were admitted into evidence. 14RT 2718-2725. He explained that the photographs showed that eight different bullets went into Achilli's body. 14RT 2725. Dr. O'Hara testified that a gunshot wound to the head, which entered the right side above the ear, went through the brain, and exited on the left side of the head, "would have been immediately fatal."

United States District Court
Northern District of California

14RT 2721. Dr. O'Hara testified that Dr. Happy phrased the cause of death as "gunshot wounds of the head and torso." 14RT 2725-2726. A death certificate showing the cause of death was admitted into evidence. Augmented #3 CT 12; 14RT 2726. Dr. Happy's autopsy report was not admitted into evidence. *See* Augmented #3 CT 11-12.

As explained, the state appellate court reviewed the pertinent United States Supreme Court and California Supreme Court authorities summarized above. *See Garcia*, 2015 WL 917801, *23-25. The state appellate court noted that while the California Supreme Court had ruled that an autopsy pathologist's observations and photographs were nontestimonial, it had distinguished those findings from a nontestifying pathologist's opinion as to cause of death. *See id.* at *25. The state appellate court concluded that even if Dr. O'Hara's testimony (regarding Dr. Happy's cause of death opinion) was testimonial, any error was harmless beyond a reasonable doubt because "[t]here was no dispute as to Dr. Happy's cause of death opinion." *Id.*

Furthermore, even if the admission of Dr. O'Hara's testimony was erroneous, the record does not support a finding that the admission had a substantial or injurious effect in determining the jury's verdict. *See Brecht*, 507 U.S. at 637. The state appellate court's ruling that any error in the admission of Dr. Happy's conclusion that Achilli died due to gunshot wounds to his head and torso was harmless beyond a reasonable doubt was not objectively unreasonable because there was no dispute that Achilli died of gunshot wounds. *See Garcia*, 2015 WL 917801, *25. Moreover, Dr. O'Hara testified, based on the photographs, that at least one gunshot wound would have been immediately fatal. 14RT 2721. For the same reasons, any error in the admission of Dr. Happy's cause of death opinion did not have a harmful and injurious effect on the verdict. *See Brecht*, 507 U.S. at 637.

Finally, in his direct appeal in state court, and by incorporation by reference in his federal habeas petition, Petitioner contends that prejudice occurred because the prosecutor based his argument that Achilli was shot at a close distance and not at point blank range, since stippling[12]

---

[12] Stippling refers to the circular pattern of dots created around a gunshot wound when a firearm is discharged in very close proximity to the skin. *See* https://en.wikipedia.org/wiki/Stippling (last accessed July 28, 2017).

was present in only one wound, on a reference to stippling in the autopsy report. Dkt. 1-3 at 13

(footnote added). Petitioner's appellate counsel argued on direct appeal as follows:

> The prosecutor argued that Estrada's alleged role as the "hitman" was proven because the book *Hit Man* advised not to shoot from long range, because aim from a distance is poor, and not to shoot from close range, because of the risk of blood splatter. "So shoot from a distance of 3′ - 6′ because you don't want to get blood on your clothing. As we know, Mark Achilli was not shot at point blank range with the gun put to his head, and the distance was very close." (RT:XIV:4338-4339) This argument referred to the autopsy report, which showed stippling in only one gunshot would, meaning that the other seven were fired from at least 3′ away.
>
> For all these reasons, this confrontation clause violation was individually and cumulatively prejudicial.

*Id.* Here, the record shows that Dr. O'Hara testified that a photograph of a gunshot wound showed

stippling and described how the presence of stippling can reveal the distance from which the gun

was fired. 14RT 2722-2724. Under both California and federal law, an expert may base his

testimony on matter that "is of a type that reasonably may be relied upon by an expert in forming

an opinion upon the subject to which his testimony relates," whether or not that testimony is

admissible. Cal. Evid. Code § 801(b); *see also* Fed. R. Evid. 703 ("An expert may base an

opinion on facts or data in the case that the expert has been made aware of . . . . If experts in the

particular field would reasonably rely on those kinds of facts or data in forming an opinion on the

subject, they need not be admissible for the opinion to be admitted."). Furthermore, in that part of

Dr. O'Hara's testimony, he did not refer to the autopsy report. 14RT 2722-2724. Because the

autopsy report was not admitted into evidence and Dr. O'Hara testified at trial (i.e., he was

available for cross-examination), the state appellate court reasonably determined that no prejudice

resulted. *See Garcia*, 2015 WL 917801, *23-25.

Accordingly, Petitioner is not entitled to relief on Claim Six, and it is DENIED.

### D. Cumulative Error (Claim Seven)

Petitioner argues that even if the errors alleged in Claims One through Six were not

prejudicial as singular errors, the combined effect of the errors created cumulative prejudice that

requires a grant of habeas relief. Dkt. 1-1 at 37-40; Dkt. 1-3 at 14. The state appellate court ruled

on Petitioner's claim of cumulative error as follows:

. . . reversal based on cumulative error is required only if a high number of instances of error occurring at trial create a strong possibility that "the aggregate prejudicial effect of such errors was greater than the sum of the prejudice of each error standing alone." (*People v. Hill* (1998) 17 Cal. 4th 800, 845.) For instance, in *People v. Hill, supra,* at pages 844 through 847, the court concluded that the cumulative impact of constant and outrageous misconduct by the prosecutor and several legal errors occurring at trial "created a negative synergistic effect, rendering the degree of overall unfairness to defendant more than that flowing from the sum of the individual errors." (*Id*. at p. 847.)

Certainly, "'[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' [Citation.]" (*People v. Cunningham* (2001) 25 Cal. 4th 926, 1009.) The combined effects of multiple errors may indeed render a trial fundamentally unfair. (*See People v. Cuccia* (2002) 97 Cal. App. 4th 785, 795.) However, as discussed *ante*, since we have found none of Estrada's claims of error meritorious and/or prejudicial, a cumulative error argument cannot be sustained. No serious errors occurred, which, whether viewed individually or in combination, could possibly have affected the jury's verdict. (*People v. Martinez* (2003) 31 Cal. 4th 673, 704; *People v. Valdez* (2004) 32 Cal. 4th 73, 128.) Simply put, since we have found no substantial error in any respect, appellant's claim of cumulative prejudicial error must be rejected. (*People v. Butler* (2009) 46 Cal. 4th 847, 885.) Estrada was entitled to a fair trial, not a perfect one. (*People v. Bradford* (1997) 14 Cal. 4th 1005, 1057.)

*See Garcia*, 2015 WL 917801, *26.

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution). However, where, as here, there is no single constitutional error as to Claims One through Six, nothing can amount to the level of a constitutional violation. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011). Accordingly, Petitioner is not entitled to relief on his claim for cumulative error, and Claim Seven is DENIED.

## IV. CERTIFICATE OF APPEALABILITY

No certificate of appealability is warranted in this case. For the reasons set out above, jurists of reason would not find this Court's denial of Petitioner's claims debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate

of Appealability in this Court but may seek a certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

## V.    CONCLUSION

For the reasons outlined above, the Court orders as follows:

1.    All claims from the petition are DENIED, and a certificate of appealability will not issue.  Petitioner's request for an evidentiary hearing is DENIED.  Petitioner may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

2.    The Clerk of the Court shall terminate any pending motions and close the file.

IT IS SO ORDERED.

Dated: November 3, 2017

_____
YVONNE GONZALEZ ROGERS
United States District Judge